Statement of the Case.
MONROE, C. J.
Decedent died on October 13, 1917, leaving neither ascendants nor descendants. He left a widow, Mrs. Pattie Ferguson; collateral relations; a separate estate, as well as his interest in the community of acquets which had existed between him and his wife for over twenty-one years; and a last will and testament. On the day following his death, C. O. Ferguson, his brother, and partner for many years in particular transactions, called upon the widow and assured her that he was her friend and would give her his assistance in the handling of her affairs, and, some days later, he stopped at her residence and ashed whether her husband had left a will, to which she replied that he had, and that it was in his safe, in the office which he and his brother-in-law, T. T. Land, had been occupying, in the Homer State Bank Building. A few days later (October 23), he called again and asked his sister-in-law if she had the combination for the opening of the safe, saying that he would like to have it; and she gave it to him, and, thereupon, without inviting her to be present, he opened the outer and main door of the safe, which, in the meantime, he had caused to be removed from decedent’s office, in the Homer State Bank to his (Ferguson’s) private office, ,as president of the Homer National Bank, in another building. He found in the main body of the safe a sum of money, said to have been “about $1,980,” and, in what he terms, “one of the pockets,” an envelope bearing the inscription, in the handwriting of the decedent, “Last Will and Testament and Agreement.” His testimony (given upon the trial of oppositions to his account as executor) as to the opening of the safe and the finding of the envelope, reads, in part, as follows:
“Q. Who was present when you got the will out of the safe? A. Mr. McKenzie. Mr. McKenzie opened the safe and took it out himself. Q. Who is Mr. McKenzie? A. Cashier of the bank. Q. Who else wa^ present? A. I don’t remember; I believe he .was there, and I was there,' and maybe one or two others. I believe Mr. Oakes was there, the assistant cashier. Q. Where was Mrs. Pattie Ferguson? A. I suppose she was at home. Q. Did you invite her down to see you open the safe? A. No, sir. * * * Q. Where did you find that will? A. In one of the little pockets of the safe. Q. In an envelope? A. Yes, sir. Q. What was written on the back of that envelope? A. ‘Last Will and Testament and Agreement.’ * * * Q. In whose handwriting was that? A. My brother’s. Q. In the envelope that was marked, ‘Last Will and Testament and Agreement,’ did you find any agreement? A. No, sir. * * * Q. Did you get hold of that envelope, or Mr. McKenzie, first? A. Mr. McKenzie took' the whole contents of that safe out.”
Mr. McKenzie called as a witness, for the executor, gave the following, with other testimony (on cross-examination):
“Q. Mr. McKenzie, were you present when that safe was first opened? A. I think I was; yes, sir. It may have been opened previously. Q. Who was with you when you first opened it? A. I • think Mrs. Ferguson and 0. O. Ferguson were present. Q. Then, the first time that you ever saw'the inside of'that safe, Mrs. Ferguson and Mr. Ferguson were there? A. Yes, sir. Q. You don’t know who had been in that safe before you saw it? A. No, sir. * * * Q. Did you see any papers when you *1015 opened that safe? A. I don’t remember them. Mr. Ferguson just asked me to count the money. I didn’t pay any attention to the papers. Q. All you did was to count the money? A. Yes, sir. * * * Q. Now, were you there when they got the combination of the inside of the safe? A. I think Mrs. Ferguson came back on the second day, the 24th. Q. You don’t know whether anybody had been in the safe, between times, or not? A. I didn’t stay with the safe. * * * Q. Did you see Mr. Ferguson open that safe before Mrs. Pattie Ferguson got there? A. I don’t remember about that.- Q. Do you remember getting a will out of the box? A. No, sir; I don’t remember it. They didn’t call me back there to look at the papers. Q. I didn’t ask you that; I asked you if you were present when Mr. Ferguson took the will out. A. I don’t remember whether I was or not. Q. Wouldn’t a thing like that interest you? A. If I wasn’t concerned, it wouldn’t. Q. Did you see anything of that kind about there? A. Not that I remember of. Q. Do you know whether you did or not? A. I don’t think I did; I think Mrs. Ferguson was there when he opened it. _ Q. And you don’t have any recollection of seeing any will there? A. No, sir; not that I remember of.”
Milton Oakes, assistant cashier of the Homer National Bank, called as a witness for the executor, gave the following, with other testimony, to wit:
“Q. (On direct examination.) Do you remember being there” (at the bank) “shortly after the time of Mr. Drew’s death, and seeing the safe opened, or the safe being opened, and remember anything about any money that was taken out of the safe? A. I wasn’t present when the safe was opened; I only saw ■■ the money after it was taken out.”
Mrs. Ferguson testifies that, having given O. 0. Ferguson the combination for the opening of the oirter door of the safe, on October 23, he came back on -the following morning (October 24) and asked her to come to the bank, saying that he wanted to open the safe (the explanation of that statement being that, though he had opened the outer door, the inner compartment remained locked, and required the use of another combination which it was thought would be found in a wooden box or cabinet, which was also locked, but of which it was supposed that Mrs. Ferguson could furnish the key). She accordingly went to the bank, carrying her husband’s keys, which she had been carrying for a year or two on account of his illness, and, when she reached there, 0. O. Ferguson said to her, before, reopening the outer door of the safe, “Pattie, did you know that we found some money in Drew’s safe?” to which she replied, “Yes, you did; how much?” Whereupon he referred to Mr. McKenzie, who was present, and who answered that the amount was about $2,000, or something less; the witness being unable to remember exactly. The outer door of the safe was then reopened, and the witness saw, “in the front part of the safe, down low,” the envelope, bearing the inscription (which, as also the will therein contained, she had frequently seen during the life of her husband), but she saw no money at that time. The envelope, the witness thinks, was already opened; and it was taken out of the safe by C. 0. Ferguson and the will found within it, but no agreement. And no such agreement as that to which the inscription on the envelope and the context of the will refer was thereafter found; nor did C. O. Ferguson thereafter furnish any information as to the substance of the agreement (which, according to the will, had been entered into by decedent and himself), or produce any copy which may have been in his possession. The will reads as follows:
“Homer, La., Sept. 25, 1908.
“I will and bequeath to my beloved wife, Pattie S. Ferguson, my residence and lot in the town of Homer, Louisiana (less that part reserved for residence and lot of C. O. Ferguson), including therewith all of my household and kitchen furniture, books, buggy and harness, buggy mare, or horse, one mule and two cows and calves.
“I also will and bequeath to my said wife one-fourth of all the property, real and personal, I own in common with Christie O. Ferguson, as per agreement this day made between C. O. Ferguson and myself.
*1017 “I also will to my said wife whatever insurance I may have at the date of my death.
“I will and bequeath to my brother, Christie O. Ferguson, three-fourths of all the property, real and personal, owned in common by us, as per the agreement this ■ day made by C. vO. Ferguson and myself; making him, C. O. Ferguson, executor of this my last will and testament, and dispensing with bond as required by law.
“This, my last will, is dated, written and signed entirely with my own hand on the date above written.”
A codicil, of date May 8, 1914, reads (so far as it needs be quoted):
“Before settlement of my estate is made, I desire that $1,000.00 be made to my niece, Mary Elizabeth Band, to be held in trust for her by her father and mother, and I, by this act, will and bequeath said sum to my said niece. * * * ”
The decedent had been a very sick man for more than a year prior to his death, and his wife traveled about with and nursed him constantly during that time. She had also been in possession of his keys, and, in going to the bank, was under the impression that the key to the cabinet containing the inside combination was among those which she carried with her. She found, however, that she was mistaken, and, concluding that she had lost it in her travels, it was decided to break open the cabinet; and, that having been done, the combination was found, the inside compartment opened, and a further sum of $4,995 was discovered, of which $4,-495 was paper money and $500 gold coin.
Mrs. Ferguson testified, on the trial of the oppositions, that- O. O. Ferguson seemed very much surprised at the discovery of the money, and said that, if he had known it was there, he would have had his brother take it out and invest it at at least 8 per cent, interest. G. O. Ferguson denied that he had made that statement and gave' other testimony, in that connection, to which we .will advert hereafter.
Mrs. Ferguson left the bank after the opening of the inner compartment of the safe; but, before she did so, G. O. Ferguson asked her if it would be convenient for her to see him that night, saying that he wanted to talk over the business between her brother and himself, and that he had rather that no one should be there, and, being informed that a lady who lived with Mrs. Ferguson retired very early, an engagement for the meeting was made with the understanding that it would be uninterrupted. After her departure from the bank, it was found that decedent was the lessee of a safety deposit vault in that institution, and that, too, was opened, with the result that an additional sum of money was found therein. The cashier says, in his testimony, that it was $4,285, but the executor has inventoried it at $2,285 (which last-mentioned amount is not disputed), making a total of $9-,260, discovered in safe and vault, which amount appears upon both the inventory and the account of the executor as belonging to the separate estate of the decedent; the question whether it does so belong being one of the issues presented for decision.
Agreeably to appointment, O. O. Ferguson called upon Mrs. Ferguson upon the evening of the day that she visited the bank, and she gives the following account of what then occurred:
“We talked over our sorrow, and we talked a while, and then he said he would like to discuss the business of the joint property — tho one-fourth I was to get under the will. He said he would like to get some paper and a pen and ink, and he would write up a contract, and, if it was agreeable with me, he would settle the joint property; that he had gone over it very carefully and that it would amount to, perhaps, $50,000, but that he would make it $60,000, and that would be giving me several hundred dollars extra. He proceeded to write the contract, and it took some time. I glanced over it. In the meantime, he had a slip of paper that hgd some figures on it. I went to gqt my glasses, and he casually tore it up and put it in his pocket — the paper with the figures on it, just a slip of paper where he had figured out the amount — and I glanced over the con *1019 tract. I read over the contract, and signed my name to it. * * * Q. You took his statement then of what the property owned in common between him and his brother consisted of? A. I did. Q. You did- not know? A. No, sir; I did not. Q. Did you ask him anything- about the contract referred to in the will? (Objection and ruling) * * * A. I don’t know that I did. Q. Did he tell you anything about it? A. I don’t think so. * * * Q. What did you have to do with the preparing of this contract? A. Nothing. * * * Q. He prepared the contract and you signed it? A. Yes, sir; entirely * * * I trusted him. He was my husband’s brother.”
In leaving the house, Mr. Ferguson took the. contract with him in order to have it typewritten, and, the -next morning, returned with what purported- to be two typewritten copies, which were signed and substituted for the original, which was then destroyed. He also brought with him his check for $5,000, wherewith he made the cash payment called for by the contract; which reads as follows:
“The following agreement and settlement is this day entered into between O. O. Ferguson and Mrs. Pattie Ferguson, both residents of said parish and state, to wit:
“As a settlement in full of all claims that the said Mrs. Pattie Ferguson has or may have in the partnership which existed between O. O. Ferguson ,and Drew Ferguson, the deceased husband of the said Mrs. Pattie Ferguson, ,the said O. O. Ferguson agrees and promises to pay to the said Mrs. Pattie Ferguson $15,000.-001, of which amount $5,000.00 is to be paid in cash — the same to be placed to her credit in the Homer National Bank; $5,000.00 to be paid on January 1, 1919, and $5,000.00 to be paid on January 1, 1920, the deferred payment to be without interest. The said Mrs. Pattie Ferguson hereby accepts the terms of settlement and approves and ratifies the same. It being entirely understood that the within settlement is in accord with the terms and requests of the late Drew Ferguson deceased, as approved by last will and testament of the said Drew Ferguson, deceased. Thus done and signed in duplicate on this the 24th day of October, 1917.”
Thereafter, O. O. Ferguson and Mrs. Ferguson had no business conversations for several months, saw but little of each other, and, during that timé, he took no steps in the matter of the opening of the succession of her husband. After that delay, he again called upon her and asked her to come to his residence, saying that he wanted again to talk over business, and she accordingly went to his house, on a Sunday, and he, then and there, took occasion to suggest to her that, in order to simplify matters and avoid trouble with the heirs, she should accept an heir’s part in the estate, and, upon her failure to adopt that suggestion, asked if she would “settle for one-half of the community,” to which she replied that she wanted what the law and 'the will gave her, neither more nor less, and so ended that conversation. On March 2, 1918, O. O. Ferguson presented the will for probate, prayed that an inventory be ordered and that he be confirmed as executor, etc., and the necessary orders having been made, and the inventory taken, that instrument was filed on March 28, 1918, and shows the interest of the decedent in the community as appraised at $24,709.81, and his separate estate at $33,839.73, but does not include, either as part of the community property or of the separate estate, the interest in the property held in common with the executor.
The widow immediately filed a pleading, in the nature of an opposition, complaining of that omission and of other alleged errors in the inventory, upon which, after hearing some testimony and the granting of a rehearing, there was a judgment to the effect that statements in the inventory purporting to attribute the ownership of the property either to the community or the separate estate be decreed as not made, that the clerk of the court be ordered to make an inventory and appraisement of all the property of the succession, without indicating whether it belonged to the community or the separate estate, and that the rights of the parties, as to the question of ownership, be reserved to be de *1021 termined in a subsequent, direct action. No such inventory appears, however, to have been made; and the executor took no further steps towards the settlement of the succession for nearly a year, when, on the application of the widow, he was ordered to file an account, which he did, on March 7, 1919; the account being arranged in sections, called “Exhibits,” designated by the letters A, B, C, D, E, F, 6, H, and I, and purporting,-respectively, to show; (A) property disposed of by the will; (B) property of the community; (O) property of the separate estate; (D) collections for account of community and miscellaneous; (E) collections for account of separate estate and miscellaneous; (F) privileged debts to be paid proportionately by community and separate estate; (6) debts paid and to be pdid by separate estate; (H) debts paid and to be paid by community; (I) proceeds of sales of property of separate estate, used for benefit, and constituting debt, of community, aggregating $14,438.25, “as shown in last item on Exhibit H.”
The collateral heirs oppose the account on the ground that it recognizes the widow of the decedent as succeeding to his entire interest in the community property; whereas, they allege, having elected to take under the will, she is not entitled so to do. They further allege, in the alternative, that the community is indebted to the separate estate in the sum of $22,528.25, or, if the $9,260, found in the safe and deposit vault, be held to belong to the community, in the sum of $31,-780.25; that, upon a proper liquidation, the community will be found to be insolvent and that there should be no distribution of its assets to the widow until the debts are paid.
The opposition of the widow is directed specifically against the different exhibits to which we have referred, and the grounds relied on by her will be considered in connection with those exhibits, respectively.
From the evidence adduced on the'trial, we make the following general statement (omitting facts already stated), to wit:
Decedent was married in 1872 to Mrs. Bettie Thomas, a widow lady, daughter of William P. Otts (one time president of the Homer National Bank, of which C. O. Ferguson became cashier and afterwards ■president), and they lived together, under the regime of the community, until three or four years before decedent’s second marriage, or say, 1893, when she died, leaving her father and sisters as her sole heirs, and in December, 1895, decedent bought from them, represented by the father, all their rights in and to her succession, otherwise described as “all the real estate and personal property of every kind, character and description, held in common, or that belonged to the community existing between the said Mrs. E. J. Ferguson, deceased, and Drew Ferguson, her surviving husband”;' the consideration for the sale being the assumption by the surviving, husband of all the debts of the community and the payment by him of $1,500, represented by his note for that amount, bearing interest at 8 per cent, fronj date, secured by mortgage upon lot 64 on the west side of the public square in Homer, and made payaole on January 1,-1897 (after decedent’s second marriage, which took place on September 28, 1896).
In (say) 1876, decedent became clerk of the district court, and he held that office for 32, years (until 1908); his net income therefrom having been about $2,000 a year. He was thrifty, however, and, having no children by either marriage, his expenses were comparatively light, and he seems usually to have had money to invest. His brother, O. O. Ferguson, as an officer of a bank, was probably in a better position to see opportunities for investments than he, and, at a very early period (prior to decedent’s first marriage, it is said), they had formed a partnership which *1023 embraced particular transactions tbat were thereafter entered into, from time to time, until decedent died; all of them, apparently, haying been conducted by, and in the name of, O. O. Ferguson. Other transactions, more or less similar in character, such as lending money on mortgage paper, buying and selling stocks and real estate, ventures in mercantile businesses and farming, etc., were entered into by decedent for his own account; some of them proving profitable and others unprofitable.
After hearing evidence and argument on the trial of the oppositions, the court a qua gave judgment ordering the executor to reform his account: (1) By listing all money on hand at the date of the decedent’s death as property of the community; (2) by listing all property owned by decedent at the time of his marriage, and so owned at the time of his death, as separate property, free from any indebtedness to the community; (3) by listing all property on hand at the date of decedent’s death, and not included in the foregoing paragraph 2 as community property, free from any indebtedness to the separate estate; (4) by charging the fee of $500 as allowed the attorney for absent heirs, to the separate estate; (5) by charging the fees of $500 and $2,500, respectively, allowed different attorneys for the executor, to the community and separate estate in proportion to their respective values; (6) by charging the legacy of $1,000 with interest, to the community interest of decedent and his separate estate, in proportion to their respective values; (7) by charging the “administrator” with interest at 4 per cent, on the funds on hand and collected since, from the dates of their respective collections; (8) further ordering that the oppositions to the claim of the widow to the decedent’s interest in the community property be rejected; (9) that, after discharging “the legacy and the costs as above stated,” the administrator turn over the property in his possession to Mrs. Pattie Ferguson and the heirs represented in the oppositions, in the proportions as shown by the final exhibits made up in accordance with this decree; that, in all other respects, the account be homologated and made the judgment of the court. All parties have appealed.
Opinion.
Following the line adopted by the counsel, we now proceed to consider the facts and law of the case in connection with the specific objections urged by the widow to the different exhibits constituting the executor’s account (the objections of the collateral heirs being necessarily included in such consideration) :
Exhibit A (property disposed of by will) is opposed on the ground that the interest of the decedent in the property held in common by him and C. O. Ferguson, and bequeathed to the latter and the widow of decedent, is valued, without specification or description, at $19,519.50, whereas, it should have been described and is well worth $60,000; and the further ground that the exhibit fails to show whether it is proposed to pay the legacy of $1,000 (to Miss Land) from the community or separate estate of the decedent.
The total valuation of the interest in question, as it appears on the exhibit, is $26,060; but, in the contract whereby opponent sold to C. O. Ferguson the one-fourth bequeathed to her, the interest of decedent was valued by O. O. Ferguson at $60,000, and we find nothing in the record which satisfies us that the valuation so made was excessive. It is true that, on the trial of the oppositions, there was produced a list of notes, stocks, buildings, and lands, purporting to constitute the property held in common, and certain figures appear opposite the various items, presumably as indicative of their values, the whole (including one note said to have been omitted) amounting to $59,975; but the list
*1025 includes neither accrued interest, dividends, nor revenues, and the valuations are those of a person deeply interested in fixing them at low figures, all of the stock (including §17,000 of bank stock) to the amount of §21,000, being valued at par, 4,176 acres of land being valued at §6 an acre, and three buildings in the town of Homer (apparently used for business purposes) being valued at a total of $12,600. The impression that we get is that the property is worth considerably more than $60,000.
The estate of the decedeit consists of his interests in the property of the community and his separate property. His interest in the property held in common with C. O. Ferguson, in the absence of evidence to the contrary, is presumed to be an asset of the community, and, having been made the subject of a special legacy (or legacy under universal title), is to be delivered to the legatees, without diminution, unless such diminution be required for the payment of debts, privileged charges, or other legacies. But there are other assets of the community, which, with the separate property of the decedent, after the delivery of the legacy thus mentioned, constitute the balance of the estate, from which the legacy of $1,000 may be paid, and we know of no law which subjects the one constituent rather than the other to its payment. We conclude therefore that it should be paid from the community interest and separate property, constituting the balance of the estate, in proportion to their respective values; the payment to be made from the funds in the hands of the executor, and without further delay, and the proportion to be paid from the respective constituents of the estate to be determined afterwards.
There is no attack here upon the contract whereby opponent, sold to O. O. Ferguson her interest in the property held in common with the decedent, and, while decedent’s interest therein should have' appeared upon the inventory and does appear upon the account, we can see nothing in the case, as developed, which requires that the items of which that interest consists should be set forth and appraised in detail, any more than the stock in trade of the Claiborne Drug Company, in which decedent was interested as a partner.
■ Exhibit B (property inventoried to the community) is opposed on the grounds:
(1) That various notes, listed thereon, are undervalued; but, by reason of an admission made by the executor, counsel for opponent say, in their brief, “We need take no further time on this question.”
(2) That the executor has failed to list thereon, as community property, 20 shares Homer Compress Company, 20 shares Pan American Life Insurance Company, 1 share Homer Ice & Fuel Company, and 10 shares Homer Cotton Oil Company; but counsel are in error. We find all those shares on the ex-, Mbit.
(3) That an item appearing on said exhibit as $3,032.21, collected for the community pri- or to the filing of the inventory, should be $3,915.46. The executor admitted that error, and, on motion, March 31, 1919, was allowed to correct it.
(4) That the executor has failed to place thereon, as community property, an item appearing on the inventory as “cash in Homer National Bank, current bank account, $3,-032.21.”
From the identity of the figures and other circumstances, we take it that the amount thus shown to be on deposit represents the collections referred to in item No. 3:
(6) That the executor has failed to place thereon, as community property, the items of cash found in decedent’s safe and safe deposit vault (or box), aggregating $9,260; and that he erred in putting those items on' Ex-Mbit C, as the property of decedent’s separate estate. We have already reviewed the testimony as to the opening of the safe and *1027 the finding of the will and of the money therein and in the safety vault; and, as the executor is the only witness who attempts to identify the money so found as that of decedent’s separate estate, we quote, in part, his testimony upon that subject, as follows, to wit:-
“Q. Now, why was the money” (referring to the money found in the safe) “placed to the account of the separate estate, and considered by you as such, and inventoried as such, instead of to the community? (Objected to as calling for the opinion of the witness on a question of law. Objection overruled. Bill reserved.) By the Court: Just state what you know, Mr. Ferguson; don’t give your opinion. A. Because he had it on hand before he married. Q. Do you know, of your own knowledge, that he did have this money on hand before that time? A. Yes, sir. Q. The money that was in the private bank box, or the private safe — the $2,285 — why was it carried to the separate estate, instead of the community? A. Because I was satisfied that it was part of the original amount that was in the safe (objection, etc.). Q. Do you know how much money Mr. Drew Ferguson had in his safe at the time he was married, in 1806, or about that time? A. I know how much money he had at the time he made a settlement. Q. Do you remember what year that was? A. 1895, April 16, I think, at night. Q. I-Iow much was there? A. He hadin',350, or $17,355, in the safe that night. Q. 'Do you know whether this money that you found in this safe, after his death, was a part of that same money that was in there that night? A. Yes, sir; I know it was part of the same money. Judging from the condition. * * * Q. Mr. Ferguson, what did ho do with the $17,350 or $17,355 that he had on the night you referred to? A. I put it in the safe for him. He and I together, counted it. * * * A. Well, I put it in the separate property because I knew it to be correct and right. I will state further that I have gone to him frequently with various settlements, and gotten money on various settlements. Q. You have gone with him, where, and gotten this same money? A. To his safe; sometimes to the clerk’s office and sometimes over here. * * * To the building where we moved that safe from.” (
On his cross-examination, he testified that he did not know the number of bills or coins of any denominations that were put into the safe, or taken out; and that he identified the money solely by reason of its musty condition when taken out, and of the fact that some of the bills were of a character that the government has ceased to issue. And the cross-examination proceeds as follows:
“Q. Mr. Ferguson, did you not tell, or say in the presence of, Mrs. Pattie Ferguson, at your office when you found this money in the safe of your brother, that you were surprised that he had it there, you would not have let him keep it there, or words to that effect, and that you would have had it in the bank, drawing interest? A. I could not have said that, for the reason that I knew the conditions under which the money was kept in the safe. Q. Then you deny that you did say that? A.. I deny it, from that standpoint, because I know it is a family secret and I don’t care to give it away. Q. Mr. Ferguson, what settlement do you refer to when you said the settlement of 1895? A. It is the settlement, Judge, when I bought my brother out and gave him a note for $20,-000. Q. Did you ever pay that note? A. I did not, because he asked me to continue the same property and see what I could do with his, and you see what has been done with it. Q. Then, when ,you had this settlement, you gave him your note for $20,000? A. Yes, sir. Q. Now what about $1,700?”' (Referring probably to the $17,350.) “A. I paid him part of that money, that night, myself, in that settlement. Q. Then you gave him your note for $20,000? A. I did, but then we had a settlement that night. Q. How much cash did you pay him? A. $1,700 or $2,000 I paid him that night. fl * * Q. You say that it was a family secret that you should check up his money — his money; what do you mean, that it was a family secret that you should check up? A. Well, there are some things that a man don’t care to have discussed. Q. That was the reason that he called you in? A. No, sir. Q. What was the reason that he called you in? A. Just in settlement that night. * * * Q. Now, if that were the occasion of that, what was the occasion of your bothering to count his money over in the clerk’s office? A. We had done that before. Q. Had you? A. Yes, sir. Q. Had you counted it since then? A. I have counted it several times. Q. How much was in there the next time you counted it? A. I don’t remember that I counted the same money over again. * * * Q. Did you ever go into his office again after 1895, and count his money, or go over, or count over, this same money? A. I don’t know that *1029 I ever cheeked it thoroughly; I have gone with him on several occasions and paid him money, and got money from him. Q. Did you ever go through his safe and count his money again? A. I don’t know that I did. Q. Now, from 1895 to 1917, was some 22 years, wasn’t it? A. Yes, sir. Q. Then are you prepared to say, Mr. Ferguson, that you know that this money that was found in his safe when you examined it here — took it from his office and opened it, in 1917, although you had not counted it or seen that money since 1895— A. I didn’t say that I hadn’t seen it. Q. Was it the same money that you put in that safe, in 1895? A. I can positively swear it. Q. Although you had not seen it in 21 years? A. Yes, sir; I have gone and seen it a good many times. Q. Do you know whether your brother ever put any more money in that safe? A. Yes, sir; several times. Q. What way have you of designating which money it was that you have found; whether it was money that he had put in, or money that you and he had put in in 1895? A. Why, just the condition and the way we put it in the safe that- night. * * * Q. Hadn’t your brother borrowed money from your bank there at various times? A. Yes, sir. Q. How is it then that, if you knew he had this $17,000 in his safe — how do you account for the fact that he would come and borrow the money at the bank, of which you wore president, and pay interest on it? A. That is very often done, Judge, by various business men. Q. Will you answer my question; why he would do that? A. It is a business proposition; I could go into it and tell you why he did that, but I don’t propose to do it, unless I am forced to. * * * Q. Was there anything about that money, any peculiarity about it, that it could have been identified from any other money, if it had been put in your bank and used? A. No, sir. * * * Q. Now, why was it that .this money wasn’t put in your bank and drawing- interest, instead of lying in that safe, during all those 20 years? A. I don’t want to answer that question unless I am forced to. I have already told you that I didn’t want to answer that question, but, if the court rules that 1 should do it, I will do it. Q. You state to the court then, under oath, that you can, positively, identify the money that you took out of his private safe, in 1917, as the identical money that was placed in the safe by you in 1895? A. Yes, sir.”
Re-examined: “Q. Mr. Ferguson, you stated that you would, if the court orders you to, state why the money was kept in the safe; that you have a reason. Now, is that reason a personal reason, or is it because you just simply don’t want the matter known? A. I don’t want the matter known; it is a matter personal to me.”
The trial judge was not asked to order the witness to divulge the secret to which he refers, and it is left in some doubt whether it concerns his family or himself alone. The fact that a secret, which he is unwilling to disclose and but for which he concedes that he would be unable to identify the money, is locked in his breast, affords no corroboration of his testimony, and there is nothing else that corroborates it save the testimony of one or two of the bank clerks to the effect that the bills taken from the safe were “musty” and appeared to be old issues (though neither of the witnesses could give the date of a single bill), and they were sent to a bank in Shrevep'ort to be forwarded to Washington City for redemption. As to the bills taken from the safety vault, they were admitted to have had a fresher appearance and were kept by the bank and put in .circulation. The gold was thought to have been of somewhat different color from that now in circulation, and one of the witnesses testified, with no certainty, that he thought some of it was minted in 1850 or 1860; but none of it, though retained by the bank, was produced in court.
Mrs. Ferguson testifies that she frequently" spent evenings with her husband, in his office, when he was clerk, and saw him put money in the safe (at one time as much as $500).
Other witnesses (called by the executor) testified that decedent would frequently overdraw his account in the bank, and would make his checks good by paying them in musty money; and that it was generally understood that he transacted his business on a cash basis, rather than by checks, and for that reason “kept on hand at all times large sums of money.”
No witness testified that paper money, locked in a safe, would not become musty in *1031 less than 20 years, and some of them thought that condition might result from such confinement in less time. E. H. Eortson, who was deputy clerk under decedent for eight years, testified that the current receipts of the office were kept in a wooden cabinet; that the safe was rarely opened, in his presence; and that, though he saw 0. O. Ferguson in the office at times, he had no recollection of its being opened on such occasions. He does not testify that he ever visited the office at night.
T. T. Land testifies that he moved to Homer in 1908 and occupied an office that decedent (his brother-in-law) had engaged for Aim in the Stone (or Palmer) Building; and that, in 1909, decedent (who ceased to be clerk in 1908) had no office; that he had left his safe in the clerk’s office, but moved it, in 1909, to Mr. Goff’s office, also in the' Stone Building, but, a few months later, moved it into his (Land’s) office; that he (Land) remained in that office for several years, during which he does not recall any visit by O. O. Ferguson, though decedent was there frequently ; that he then moved to another building, and decedent occupied the office with him, but left the safe in the Stone Building; that he then moved (and decedent with him) to the State Bank Building, and the safe was moved into the office there secured, and he and decedent were occupying that office when decedent died; that he does not recall any visit by O. O. Ferguson to that office.
We find nothing in the evidence that satisfies us that decedent possessed any means in 1872, when he married his first wife, and it is shown that on December 20, 1895, perhaps, about 18 months after her death, 8 months after the alleged settlement with C. O. Ferguson, and 9 months before his second marriage, he bought from the heirs of his first wife, represented by her father (who was cashier or president of a bank in Ho-1 mer) all of their rights in her succession, otherwise described as “all the real estate and personal property of every kind, character, and description, held in common or that belonged to the community of acquéts and gains existing between said Mrs. E. J. Ferguson, deceased, and Drew Ferguson, her surviving husband’,’; the consideration therefor being his assumption of the debts of the community and his note for $1,500 secured by mortgage, and made payable on January 1, 1897 (after his second marriage, which took place on September 28, 1896), with interest at 8 per cent., from which it would appear that the first community, at the time of its dissolution (in, say, 1S93), was worth $3,-000, and that decedent was worth the half of that amount. Apart from that circumstance, which no more corroborates the testimony of C. O. Ferguson to the effect that decedent, on April 16, 1895, possessed $17,350 in cash, and the note of a solvent maker for $20,000, 'than does his undisclosed secret. Mr. Ferguson, in giving his testimony, has shown some unusual defects of memory, which have brought that testimony in conflict with itself and with that of his own witnesses. As. we have shown, he stated distinctly and categorically that Mrs. Pattie Ferguson was not invited by him to be present, and was not present, when he opened the safe on October 23, and, apparently, intends to create the impression that he then opened it for the first time; and he further testifies that it was not he, but McKenzie, who took out the envelope containing the will, and that Oakes was probably present. Being followed by McKenzie, who testified that he had absolutely nothing to do with the matter, save by request, to count the money that was found in the safe, that he was unable to remember that he had even seen any papers, volunteered the statement that the safe might have been previously opened, and testified that Mrs. Ferguson was present on *1033 October 23, as well as on the following day. Mr. Ferguson, thereafter, also testified that he thought that she was present on the two occasions, but immediately conceded that she may have been correct in saying that she was not there on the 23d. He was asked how the combination for the opening of the safe reached him, and was unable to remember, but thought it might have been sent to him, without request, by Mrs. Pattie Ferguson. He, at one time, says that he was able to identify the money found in the safe, by reason of its condition, and the way in which it was put in; but he also assumes to identify the money found in the safety deposit vault, which is shown not to have been in the same condition as the other, and which he does not pretend to have put in the vault; and, in the last analysis, his reason for being able to identify the money was said to be found in a secret, concerning his family, or himself, or both, which he was unwilling to disclose, and which the counsel for the opponent did not insist upon his disclosing because they felt that the burden of proof rested upon those who claimed that property found in the succession of the decedent belonged to his separate estate to establish that claim by affirmative evidence. The testimony of Mr. Ferguson, and Mr. McKenzie, is open to criticism in other respects than those stated; and that of Mr. Ferguson is equally remarkable for its omissions. It will be noted that the decedent makes the bequest to his brother and his widow “as per the agreement this day made by'O. O. Ferguson and myself” (that expression being twice used, and presenting a question as to whether the will can be properly interpreted in the absence of the agreement). Mr. Ferguson does not deny the existence of the agreement thus referred to, and, its existence being conceded, it is fair to assume that, as a party thereto he is cognizant of its substance, and, in all probability, possesses a duplicate or copy of it. But we find no suggestion from him that he be allowed to give the court or the litigants the benefit of his information on that subject; from which, as the average man is apt to be influenced by his interest, it might perhaps be assumed that it is to the interest of the witness that the agreement should be suppressed, rather than produced.
[1-3] The law (C. C. art. 2405) declares that—
“Art. 2405. * * * At the time of the dissolution of the marriage, all effects which both husband and wife reciprocally possess are presumed, common effects or'gains, unless it be satisfactorily proved which of such effects they brought in marriage, or which have been given them separately, or which they have respectively inherited.” As a further;
“Art. 2287. — Regal presumption dispenses with all other proof, in favor of him for whom it exists.”
Our conclusion upon this branch of the case is that the-evidence adduced for that purpose is insufficient to rebut the presumption thus established, and that the money in question was properly held, by the trial judge, to belong to the community and not to the separate estate of the decedent. Succession of Manning, 107 La. 456, 31 South. 862; Succession of Coste, 43 La. Ann. 144, 9 South. 62; Denègre v. Denègre, 30 La. Ann. 275.
6. That said exhibit fails to recognize the claim of the community against the separate estate of the decedent for the reimbursement of community funds, expended in im-. proving certain lots in the town of Homer, owned by decedent, and forming part of his separate estate, and enhancing their value to the extent of $4,000 each, for the lots occupied by the Claiborne Drug Company and J. L. Ferguson, respectively, and $1,000 for the lot occupied by the Green Restaurant. Counsel for opponent, in their brief, reduce the claim as to the two lots first mentioned to $3,250 for each lot, and increase it to $1,-500 as to the lot last mentioned. The evidence is conclusive to the effect that the im *1035 provements (consisting of tlie erection of buildings) were made by decedent during tlie existence of tlie community between him and opponent, and that they enhanced the value of the lots to the extent alleged; but, though a litigant may prove, and recover less, he cannot recover more, than he sues for, even though he prove niore. Counsel for the executor, and for the collateral heirs, do not, in their briefs, specifically contest this claim; but, as there is involved in the question of opponent’s right to recover the whole amount claimed, the question of her right to take, by inheritance, the interest of the decedent in the community property, other than that disposed by the will, that question may as well be now considered.
Prior to 1910, article 915 of the Civil Code declared that, in the event of the death of husband or wife, leaving neither ascendants nor descendants, and without having disposed, by will, of his or her share in the community property, such share should be held by the survivor, in usufruct, during his or her natural life. In the interpretation of that article, it became settled jurisprudence (and could not well have been otherwise) that, where a married person died, leaving ascendants or descendants, or leaving a will, disposing of his or her estate, the surviving spouse was not entitled to the usufruct for which the article provides.
By Act 57 of 1910, the article in question was amended and re-enacted, so as to read:
“In all cases when either husband or wife shall die leaving no deseendents, or ascendents and without having disposed by last will and testament of his or her share in the community property, such undisposed of share shall be inherited by the survivor in full ownership.”
And by Act 80 of 1916, the act of 1910 was amended and re-enacted, so as to include all that is above quoted and to add thereto (after the word “ownership”) the following:
“But in the event the deceased should leave deseendents his or her estate shall be inherited by them in the manner now provided for by law. But should the deceased leave no deseendents, but a father and [or] mother, or both, the estate shall be divided into two equal portions, one of which will go to the father and mother, or survivor of them, and the other portion to the surviving spouse.”
In the instant case, the decedent left neither ascendants nor descendants; nor did he, by last will, dispose of his share of the community property (save as included in the bequest to his wife and brother), since he made no special bequest to that effect and named no universal legatee.
If the one-half interest, in the property held in common by decedent and C. O. Ferguson, which decedent bequeathed to his wife and C. O. Ferguson, in the proportions of one-fourth to the wife and three-fourths to O. O. Ferguson, belonged to the community, the wife, upon the ■ dissolution of the community, owned a one-fourth interest therein, in her own right, and the bequest to C. O. Ferguson included more, by one-fourth, than the testator had the right to dispose of. But, in any event, it was not a disposition of his entire interest in the community, but only of his interest in particular community property, and hence was not a disposition of “his share in the community property,” within -the terms or meaning of the statute; and it follows that, upon the dissolution of the community, the widow became the owner of one-half of its property, in her own right, and of the other one-half under the statute above quoted, subject, of course, to payment of the community debts and to any partial disposition that the decedent may have made of his half interest.
[4] Whilst therefore opponent, if she were here claiming only the half interest in the community property to which she is entitled of her own right, could recover, under C. C. art. 2408, only “one-half” of the enhanced value of the separate estate of the decedent, *1037 resulting from tlae improvements, her right of recovery, 'as the matter stands, extends to the whole amount of that value, since the separate estate was indebted to the community for the whole amount, and, under the pre-existing law, the quoted statute, and the bequest, she is entitled to all the debts due to the community, just as she is entitled to any other assets thereto belonging; for, in dealing with the question here presented, the community (using the language of this court, in Childers v. Johnson, 6 La. Ann. 641) is “an ideal being, distinct from the persons who compose it, having its rights and obligations, its assets and liabilities, its debtors and its creditors,” and the right which the decedent had, as a partner in the community, against his own separate estate, to one-half the debt, due by that estate to the community, he might have disposed of by his will, as he might have disposed of his share in any other assets of the community, and in default of such disposition, and of ascendants or descendants, that asset devolved on his widow, as the legal heir of his undisposed share of the community property.
7.That the exhibit fails to recognize, as community property, the enhanced value, through accumulated dividends, of the Claiborne Drug Store, amounting to $3,000.
From the relevant testimony, it appears that decedent formed a partnership (prior to his marriage) with C. O. Ferguson and J. L. Ferguson, and that the partnership acquired the assets and business of a concern which has been conducted as the Claiborne Drug Company, the consideration being certain property, valued at about $6,000, which was given in exchange; that they subsequently took in J. W. Menefee as a partner, each of them giving him one-eighteenth interest in, and making him the manager, of the business ; and that he has, since then, so well discharged the duties of that position that, although the other partners have, from time to time, withdrawn considerable sums of money from the business for the purposes of a land and farming venture in the parish of Natchitoches, the remaining profits have been used to increase the capital which is now invested in assets to the value of 18 or 20 thousand dollars; and, as the profits accruing from the separate property of the husband fell into the community, and were thus re-invested, we are of opinion that opponent’s claim for $3,000 should be recognized as for an amount equivalent to five-eighteenths of the difference between $6,000 and the value, at the date of decedent’s death, of the capital and stock in trade of the Claiborne Drug Company, subject, however, to .the liquidation and settlement of the partnership and the discharge of the obligations of the partners inter sese.
8. That the exhibit fails to include, as due by the separate estate of the decedent, $500 paid, after the marriage, to the heirs of decedent’s first wife for property acquired pri- or to the marriage; and $350 so paid, for such property, to E. A. Kelly; and $590 collected as interest on $1,500 notes of Marshall Edwards and Sidney Dorton, from November 15, 1912, to October 13, 1917.
We find no objection by the collateral heirs to the claims thus mentioned, and the two first should be allowed (in fact, the evidence shows that decedent gave a note to the heirs of his first wife, for $1,500, payable on January 1, 1897). As to the third claim, we take it to be included in the obligation assumed by the executor in giving his testimony, to account for all notes, with the interest called for' by them, and the- interest earned upon the notes in question would appear to fall into the community.
9. That the exhibit fails to show, as community property, $200 of dividends collected from the Homer Compress Company; $128.-33, one-third rent collected from Homer Farm; and $193.79 received for cotton ear-
*1039 ried on the inventory. Those items are listed to the community as collections made since the filing of the inventory.
Exhibit 0 (purporting to be a list, as inventoried, of property belonging to the separate estate of the decedent) is opposed, in so far as it includes the $6,975 found in the safe, and the $2,285 found in the safety deposit vault, which items should be stricken off.
Exhibit D (purporting to show “amounts collected for community, since inventory was made and filed”) is opposed on the ground that certain items appear therein as “miscellaneous collections,” whereas they should be credited to the community.
The legend at the head of the exhibit indicates that all collections listed thereon were thereby credited to the community, and the counsel for the executor say, in their brief, that they propose to turn over to the community all property listed on Exhibits B and D.
Exhibit E (purporting to show collections for separate estate) appears to be unopposed.
Exhibit P (purporting to show privileged debts to be paid and borne by separate estate and community in the proportions of two-fifths to the separate estate and three-fifths to the community) is opposed, on the grounds:
(1) That the fee of the attorney for absent heirs should be charged against the inheritance falling to such heirs.
(2) That the taxes should be charged to the separate estate, or community, as the property may he found to belong to the one or the other; and that the amounts are incorrect.
. (8) That the fee allowed Goff & Barnett is out of proportion to the service rendered.
(4) Tfiat the legacy of $1,000 to Miss Land should be paid from the separate estate.
(5) That the exhibit, arbitrarily, fixes the pro rata of the privileged debts at two-fifths to the separate estate and three-fifths to the community, whereas each of those estates should pay a pro rata of said debts, to be determined by its value.
(1) The fee of the attorney for absent heirs should be charged against the inheritance devolving on them, and not upon the entire estate. (2) The taxes should be charged against the property upon which, respectively, they are assessed, and, where that is impracticable, against the separate estate and community, respectively, in the proportions that the value of the property belonging to the one estate bears to the value of that belonging to the other. (3) The fee of $2,500 allowed Messrs. Goff & Barnett does not appear to be disproportioned to the services which they are shown, from this record, to have rendered. (4) The legacy of $1,000 to Miss Land is properly payable from the entire estate of the testator (save that portion bequeathed to the oi:>ponent and O. O. Ferguson), which includes the half interest of the decedent in the community as well as his separate estate. (5) The privileged debts should be paid by the separate estate and the community, respectively, in the proportion that the values of those estates as they may be determined under the judgment, bear to each other.
Exhibit G (purporting to show debts, paid and to be paid by the separate estate).is not specifically opposed, but the item reading “three-fifths of privileged claims, as set forth in the Exhibit F, above, $1,500.00,” was amended by. changing the figures “$1,500.00” to $3,810.72, and the total figures from “$1,-658.17” to $3,968.89. The question of the prorating of the privileged claims is necessarily governed by the ruling last above made.
Exhibit H (debts approved, paid, and to be paid by community) is opposed, in general terms; but the attention of the court is particularly called to the following items, to wit:
*1041 “(1) % Natchitoches land note, $3,555.06— $888.T6, and interest
“(2) Homer National Bank, timber note, $489.77
“(3) 2/g privileged claims, as set forth in Exhibit F, $1,000.00
“(4> Debt due separate estate of Drew Ferguson for money from safe, $8,090.00.”
[5-7] 1. It appears that the three Messrs. Ferguson, members of the Claiborne Drug Company, together with a Mr. Dawson, bought a large tract of land in the parish of Natchitoches, upon which, in paying the price, improving, and farming it, they spent a good deal of money; a considerable portion of which was drawn, somewhat informally, apparently, from the business of the drug company. The note for $3,555.06 is said to have been executed by the Messrs. Ferguson for the purposes of that enterprise, and’ to have been paid by the drug company, which now asserts the claim for $888.76 and interest against the succession of one of the partners, as for one-fourth of the amount of the debt due to the partnership. But it will be time enough to assert that claim, when, upon a settlement of the partnership, it is ascertained that he owes it anything. A partnership has no right of action against one of its members, upon a particular claim arising in the course of the partnership business; the remedy is by a suit for the liquidation and settlement of the partnership, which would seem to be all the more necessary in this instance, since, in the absence of an express provision to the contrary, in the contract, of partnership, the Claiborne Drug Company was dissolved by the death of Drew Ferguson.
2.“The timber note” (as it is called) was given by Roy Burk, holder, to the bank of which C. O. Ferguson is president, to make good an overdraft, and there is some testimony whereby it is thought to connect the decedent with the matter, but which in our opinion fails to do so. The item should therefore be stricken off.
3. This item falls under the ruling, upon the question involved, made with respect to privileged claims as appearing on Exhibit F.
4. This item falls under the ruling heretofore made with reference to money found in safe and safety deposit vault and omitted from property listed to the community; our conclusion being, in effect, that the evidence fails to show that decedent had $17,350 in his safe at the time of his marriage, or prior thereto.
The last item on Exhibit H calls for $14,-438.25, and reads:
“Amount due separate estate of Drew Ferguson for prices received for separate real estate sold and used by the community as shown by Exhibit I.”
Which exhibit is opposed as to many items designated by numbers which are supposed to correspond with numbers on the exhibit, but the items on the exhibit are not numbered, and, by count, do not run as high as those on the opposition, and there are other discrepancies, which render it impossible to identify them by the numbers given in the opposition. The same may be said of certain admissions disclosed by the record as to the items on the exhibit, and hence we should consider it unsafe to attempt to identify them.
The opposition, however, is based upon two grounds:- First, that the items of property listed on the exhibit did not belong to the separate estate of the decedent; and, second, that, though they did so belong and were sold after the marriage, it is not shown that the proceeds inured to the benefit of the community, and hence is not .shown that the community is the debtor of the separate estate. Whilst, therefore, for the reason above stated, we are unable, at this time, to pass upon the questions of title there is nothing to prevent our determining .the question of the liability of the community for the price of any property of the separate estate that may have been sold, since there is no direct evidence that any such proceeds inured to *1043 the benefit oí the community; the sole reliance of the executor and the collateral heirs resting upon the fact that the sales were made during the existence of the community. But that fact, though entitled to consideration, as a circumstance from which the inference of benefit to the community may be drawn, is not of itself sufficient.
“In order” (this court has frequently held) “that the community be held liable for the proceeds of the sale of the separate property of the husband, received and disposed of by him, during the existence of the community, it must bo proved that such proceeds were expended for.the benefit of the community.” Dillon v. Freville, 129 La. 1005, 57 South. 316; Munchow v. Munchow, 136 La. 758, 67 South. 819; Succession of Lyons, 50 La. Ann. 50, 23 South. 117; Heirs of Gee v. Thompson, 41 La. Ann. 354, 6 South. 548; Succession of Foreman, 38 La. Ann. 700.
It has been said that there is no fixed rule as to the evidence required to establish a claim such as that under consideration; that every case must be governed by its own circumstances. ■ And that is quite true in the sense that there is no fixed rule whereby the exact amount and character of the evidence that may be required to satisfy the court in every, or any, case, can be determined; but it is to be remembered that the law declares, in express terms, that “all effects” in the possession of either of the spouses, at the time of the dissolution of the marriage are presumed common effects, “unless it be satisfactorily proved” that they are not so. The husband, being master of the community and also master of his own estate, may invest the funds of either at his pleasure. If he thereby acquires property, it is presumed to belong to the community; but, if he makes a loss, there is no presumption that he lost the funds of the community. So that, if, at a given time, a married man has $50,000; of funds his separate property, and $50,000 of community funds, and he thereafter dies, leaving property worth only $50,000, and acquired during the existence of the community, the whole of it is presumed to have been acquired with the funds of, and to belong to, the community, and the mere inference, however reasonable it might appear, that he had invested and lost the funds of the community and his separate funds in equal proportions, would be inadmissible. 1-Iis heirs would be obliged to rebut the presumption, established by law, that all the effects so left, belonged to the community, and prove, affirmatively, not that the decedent had had separate funds, and that they were no longer to be found, but that he had invested them in the particular property found in his succession.
In the instant case, the executor, in order to sustain the theory, in which he seems to have indulged, that the decedent herein was poorer at the dissolution of his last community than at the beginning, mentions a number of instances in which he is said to have made losses, aggregating, say, $16,000, and our present impression is that he omitted the Natchitoches land and farming venture, in which another of the partners testified that they had expended $40,000 and made no profit. On the other hand, he rather belittled the investments which decedent might have found profitable, and fails to mention the fact he had for 10 years been a partner in a grocery and general store, and, upon an investment of $800, had made a profit of $1,000 a year during that time, and then, in 1910, had sold his interest to his copart-ner for $2,100 in cash. I-Ie also failed to inform the court of the amount of the income that the decedent received from the $60,000 which he (the witness) held for his account, the larger part of it being invested in notes and bank stock. And he appears to have been unable to say (and no other witness did so) that he knew with certainty of a single investment in property bought during the existence of the last community, and that was *1045 in decedent’s possession at tlie time of its dissolution, that had been made with his separate funds. We conclude, then, that the evidence does not rebut the presumption that such property belongs to the community, or show, “satisfactorily,” that the community is indebted for the money so invested.
It is therefore adjudged and decreed that the judgment appealed from be amended in so far as that it is now ordered:
1. That the executor amend Exhibit A of his account by increasing the valuation of the property bequeathed to Mrs. Pattie Ferguson and himself to not less than $60,000.
2. That he amend Exhibit B: (a) By placing thereon, as community property, the items of cash found in decedent’s safe and safety deposit vault, amounting in the aggregate to $9,260. (b) The sum of $7,500, as a debt due, by the separate estate of decedent to the community, for enhancement in the value of the lots belonging to said es-'l tate by reason of improvements placed thereon at the expense of the community, (c) The claim of the community against the Claiborne Drug Company, for $3,000, representing the enhancement in the value of the decedent’s five-eighteenths interest in the capital stock of the said company, resulting from the reinvestment therein of the profits of the. business which had inured to the community, with the recognition of the right of the opponent, Mrs. Pattie Ferguson, to assert said claim (as the owner and successor to all the rights of the community) in the liquidation and settlement of the partnership doing business as the Claiborne Drug Company. (e) The sums of $500 and $360, as debts due by the separate estate of the decedent to the community, in reimbursement of community funds expended in paying for property bought by the decedent from tbe heirs of his first wife and from E. A. Kelly, and inuring to said separate estate; and the sum of $590 collected as interest on notes of Marshall Edwards and Sidney Dor-ton.
3. That he strike Exhibit O from the account.
4. That he amend Exhibit F: (a) By striking therefrom the item of $500, allowed as fee to the attorney for absent heirs and charging same against the inheritance falling to such heirs, (b) By charging the taxes to the property against which, respectively, they are assessed, or, if that be found impracticable, against the community and separate estate in the proportion that the value of the one estate bears to that 'of the other, (c) By charging the privileged claims, other than taxes, against the community and separate estate in the proportion above stated.
5. That he amend Exhibit G by charging the taxes in the manner prescribed in the ruling relating to the amendment of Exhibit F.
6. That he amend Exhibit H by striking therefrom the item “14 Natchitoches land note $3,555.06 — $888.76,” without prejudice to the right of the parties interested to assert their claim, in the liquidation and settlement of the affairs of the Claiborne Drug Company; (b) by striking therefrom the items, “Homer National Bank $489.77,” and “Debt due separate estate of Drew Ferguson for money in private safe and used for community $8,090.00”; (e) by charging the privileged claims referred to in the item, “% of privileged claims, as set forth in Exhibit F, above, $1000.00,” in the manner prescribed in the ruling relating to the amendment of Exhibit F.
7. That, in so far as Exhibit I purports to-recognize the claim, here set up, on behalf of the separate estate of the decedent for reimbursement of the proceeds of property of that estate as having been used by or for the benefit of the community, said exhibit be stricken from the account and the claim rejected.
*1047 It is further ordered and adjudged that the opponent, Mrs. Pattie Ferguson, be recognized as having succeeded, upon the dissolution of the community lately existing between decedent and herself, to the full ownership, in her own right, of one-half of the community property, and, by inheritance from her husband, to the full ownership of the other one-half of said property, subject, in both cases, to the payment of the community debts, and, in the case of the inheritance, to any mortuary disposition that her husband may have made of his interest.
It is further decreed that, in all respects save as hereby amended or affected, the judgment appealed from be affirmed, and the eases remanded to the district court for the execution thereof, as thus amended, and in accordance with the views hereinabove expressed, the costs of the litigation, thus far incurred, to be paid from the assets of the community and the separate estate of the decedent, in proportion to their respective values.