162 So. 44

**HARMAN v. DEFATTA et al.**

No. 33268.

April 29, 1935.

Rehearing Denied May 27, 1935.

Frank O. Looney, of Monroe, for appellant.

Herold, Cousin & Herold, of Shreveport, for appellee.

ODOM, Justice.

At some time prior to the year 1931, plaintiff loaned Frank Defatta $8,000 and took his note secured by first mortgage on certain real property in Shreveport. Defatta defaulted, and on November 25, 1933, plaintiff obtained judgment against him for said amount, plus interest, costs, and attorneys' fees. The hypothecated property was sold under a writ of fieri facias and bought in by plaintiff for $4,900, which was credited on the judgment. At the time the loan was made and for some time thereafter, Defatta owned some ten or twelve other pieces of property in and near the city of Shreveport, all of which property was unencumbered. During the year 1931, and subsequently, but prior to the date on which plaintiff obtained his judgment, and while Defatta was indebted unto plaintiff, he made various transfers of property to his wife and other members of his family, among them being one to his son Philip Defatta, for a purported consideration of $2,150. This particular sale was made on June 8, 1933, about five months before plaintiff obtained his judgment.

Plaintiff brought the present suit on March 10, 1934, alleging that this was not a real, but a simulated, transaction, and prayed that it be set aside for that reason. Frank Defatta and Philip Defatta were both made parties defendant. They answered setting up that the transfer was not simulated, but was made for the purpose of liquidating a past-due indebtedness of Frank Defatta to his son Philip. Plaintiff then amended his petition, converting the suit into a revocatory action, making all proper and necessary allegations. The trial judge revoked the sale, and defendants appealed.

Frank Defatta testified that at the time he transferred this property to his son, Philip, he owed him $2,150, and that the transfer was made in satisfaction of that debt. Philip Defatta gave similar testimony. The circumstances connected with this, as well as other transfers which Frank Defatta had made to his wife and other members of his immediate family, are so suspicious that we cannot believe that Frank Defatta owed his son Philip that much. Frank transferred this property to his son Philip, some to his wife, some to another son, and some to a son-in-law, and in each instance declared that the transfer was made in satisfaction of a pre-existing debt. Frank had been prosperous, and it is passing strange that he did not pay his wife and sons what he owed them, if anything, sooner.

█ However, as to this particular transaction, the testimony shows that Philip Defatta did at one time let his father have $300, and therefore, inasmuch as there was some consideration paid, although inadequate, the transfer cannot be annulled as a simulation. Renshaw v. Dowty, 39 La. Ann. 608, 2 So. 58.

This transaction, according to the testimony of defendants, was not a simulation, but a dation en paiment, which "is an act by which a debtor gives a thing to the creditor, who is willing to receive it, in payment of a sum which is due." Civ. Code, art. 2655. But an insolvent debtor is forbidden to give in payment to one creditor to the prejudice of the others any other thing than the sum of money due (Civ. Code, art. 2658), and the law gives to every injured creditor an action to annul any contract made in fraud of his rights. Civ. Code, art. 1970.

█ A dation en paiment by an insolvent debtor to one of his creditors cannot be set aside merely and solely because the transferee is a creditor and the indebtedness the consideration of the transfer, because it might well be that the transfer was not injurious to the other creditors. Such cases are not within the scope of the revocatory action; one of the elements of which is injury to the other creditors. Baldwin, Receiver, v. McDonald, 48 La. Ann. 1460, 21 So. 48.

█ But where a debtor has not sufficient property or means to pay all his debts, a transfer made by him to one of his creditors in satisfaction of a pre-existing debt is an unfair preference given to such transferee over the other creditors, and is considered as having been made in fraud of their rights. This is upon the principle that the word "fraud," as used in the articles of the Code relating to fraudulent transfers, means "any unfair preference which the debtor may give to one of his creditors over the others, by selling or mortgaging to him a portion of his property for a debt existing before the contract." Civ. Code, art. 3360.

More than a century ago it was held by this court in Taylor et al. v. Knox et al., 2 La. 16, that:

"A sale of property by a debtor who has not sufficient means to pay all his debts, made to one set of creditors, will be considered in fraud of the rights of the remaining creditors, and will be annulled and set aside, though made in ignorance on the part of the vendees, as to approaching insolvency, and in all other respects executed with the utmost good faith."

In Lovell v. Payne et al., 30 La. Ann. 511, the court said: "A sale to pay one creditor, even ignorant of the debtor's insolvency, is a fraud on the other creditors" —citing Taylor v. Knox, 2 La. 16, Zacharie v. Buckman, 8 La. 305, 308, and Quartreveaux v. Caboche, 14 La. 365, 367. These cases were followed in Fishel v. Erwin et al., 132 La. 344, 61 So. 397. See, also, Ventrilla v. Tortorice et al., 160 La. 516, 107 So. 390, and Southland Investment Company v. Michel, 149 So. 177 (Court of Appeal, Second Circuit).

In the absence of testimony to the contrary, it is presumed that a transfer made by an insolvent debtor to one of his creditors in consideration of a past-due debt results in injury to the other creditors.

The remaining question in this case then is whether Frank Defatta, the transferrer, was insolvent at the time the transfer was made.

"By being in insolvent circumstances is meant, that the whole property and credits are not equal in amount, at a fair ap-

praisement, to the debts due by the party." Civ. Code, art. 1985.

A showing that a debtor is under protest or in default and does not pay his debts does not mean that he is insolvent. In order to establish insolvency it must be shown that all his property and credits are not equal in amount, at a fair valuation, to the debts due by him. Lea v. Bringier, 19 La. Ann. 197.

The Civil Code provides (article 1985) that: "If he, who alleges the insolvency shows the amount of debts, it is incumbent on the other party to show property to an equal or greater amount." Plaintiff, who alleged that Frank Defatta was insolvent, proved that he owed debts amounting to approximately $24,300. Defendant sought to show that all his property at a fair valuation was worth more than that amount, and to do this he called Mr. R. S. Whitten, a realtor of Shreveport, who appraised the property at considerably more than the amount of the debts. But the trial judge was of the opinion that defendants had not discharged the burden that the law lays upon them. Here is what he says:

"If the testimony of Mr. Whitten, a competent real estate appraiser, can be accepted as proof of value, then defendants have met the test. The testimony of Mr. Walker, another competent appraiser, is fragmentary, and it shows that he did not make the careful appraisal that was made by Mr. Whitten.

"Mr. Whitten's appraisal meets all the tests as applied to normal times, but in spite of all the moratorium laws recently passed, we cannot overlook the fact that we have been having a depression since the fall of 1929, and that in June, 1933, everything was at about its lowest ebb.

"Mr. Whitten undoubtedly, in most instances, in figuring value of improvements, used replacement costs which in normal times is a correct method, but in abnormal times, such as these, replacement costs may be out of all proportion to actual value, depending upon the character of the neighborhood and the rental or sales calls for such improvements. It can easily be seen that a $2000 building in a neighborhood of many vacancies has very little actual value and is sometimes a liability rather than an asset.

"Mr. Whitten's testimony as to his method of valuing the real estate shows that he based his values not upon boom times like we had immediately preceding the crash of 1929, and not on depression values, but upon what he conceived the property should be worth in normal times. If the crisis through which this country has been passing were a temporary thing, Mr. Whitten's theory might be correct, but it is not temporary.

"Mr. Whitten admits that he knew of no other method to use in the absence of willing buyers. We do not think it would be fair to the owner of property to say that such property is worth just what it will readily sell for; neither do we think it a correct test to say that same is worth what it will cost, at present prices, to replace the improvements, less depreciation, plus the value of the lots based on normal times. We must know that such a valuation is bound to be fictitious. We therefore cannot accept this appraisal as correct and without it there is not sufficient evidence in the record from which any conclusion can be drawn as to the total value of the property. These defendants have not met the burden as to value."

Mr. Whitten does not say that he based his appraisement of Frank Defatta's property at the time this transfer was made in June, 1933, at its then "market value," nor does he or any other witness say that there was any market value for such property as Defatta owned at that time. As a matter of fact, it is shown that there was none, as there were no "willing buyers."

In Louisville & Nashville R. R. Co. v. R. E. E. DeMontluzin & Co., 166 La. 211, 116 So. 854, 855, we said:

"The market value means the fair value of the property between one who wants to purchase and one who wants to sell, under usual and ordinary circumstances."

In Wall et al. v. United Gas Public Service Co., 178 La. 908, 152 So. 561, 564, in speaking of "market value," we used the following quotation from Muser v. Magone, 155 U. S. 240, 15 S. Ct. 77, 39 L. Ed. 135:

" 'Market value' * * * is the 'price at which the owner of the goods or the pro-

ducer holds them for sale; the price at which they are freely offered in the market to all the world; such prices as dealers in the goods are willing to receive, and purchasers are made to pay, when the goods are bought and sold in the ordinary course of trade.'"

The Code, in speaking of what "insolvency" means, does not mention "market value," but says that if the whole property and credits "at a fair appraisement" are not equal in amount to the debts, the debtor is insolvent. The only way to make a fair appraisement of property is to find its "fair value." The federal statutes relating to bankruptcy and the method of determining solvency use practically the same terms as those used in our Code. In Grandison v. National Bank of Commerce (C. C. A.) 231 F. 800, 804, the court said:

"The term 'fair valuation,' as used in the Bankruptcy Act [11 USCA], means the fair cash value or the fair market value of the property as between one who wants to purchase and one who wants to sell the property."

In Hard & Rand v. Biston Coffee Co. (C. C. A.) 41 F.(2d) 625, 627, the court said:

"Where value is an issue, the inquiry may properly be allowed to take a wide scope. Evidence of the cost, selling price, replacement value, depreciation, use value, junk value, location of the property, local demand for it, and many other things may be shown."

The word "value" has two different meanings. One may be termed "value in use"; the other "value in exchange." "Exchange value" of property is the price it would bring in the market. It means the same thing as "market value." But the fact that property has no market value does not necessarily mean that it has no value at all, because it might have a "use value." Residential property might have no market or commercial value, and yet be very valuable to the owner for the use he could make of it. Even though property built for commercial purposes could not be sold at any price on account of depressed market conditions or its location, yet if the owner could use it for his own purposes or could lease it, it would be a valuable asset to him, and in determining the question of solvency vel non of an embarrassed debtor, he should be given credit for the use value of his property, if it has any, even though it has no commercial value.

But in either event the appraisement or value of property must necessarily be based upon conditions as they exist at the time the appraisement is made or the value is sought to be fixed, and not upon what witnesses may think were normal conditions. The question as to what normal conditions are is a matter of individual opinion, as to which the best business men sharply disagree. The value of property shifts from year to year, and even from day to day. In determining whether one is solvent at a given time, the value of his property a year or five years before or un-

der normal conditions cannot be considered. It is present value or value at the time which governs.

 Mr. Whitten's appraisement of the lots and lands owned by Frank Defatta was based on what he termed "normal conditions," and not on conditions as they existed in June, 1933. His appraisement of the improvements was based upon the cost of replacement, less depreciation. That would be proper, no doubt, under normal conditions, but, as the trial judge said, no one would build houses which, when finished, could neither be used, leased, nor sold under such conditions as then existed.

As defendants failed to show either the commercial or use value of the property under conditions which prevailed at the time the alleged fraudulent transfer was made, they failed to discharge the burden which the law lays upon them.

The judgment is affirmed.