HAMITER, Justice.
 

 Eula Mae Vines Combre, administratrix of the estate of her late husband, Oliver Combre (hereinafter sometimes referred to as decedent), and natural tutrix of their
 
 *963
 
 minor child (Beatrice), seeks in this cause the revocation or annulment of an act of sale executed by decedent in favor of his sister, Hattie Combre Brown, which affects certain real estate in the City of New Orleans known as Municipal No. 4115 Clio Street.
 

 Plaintiff, under the authority of Civil Code Article 2239, alleged that the purported sale .is a fraudulent simulation. Defendant, Hattie Combre Brown, denied the allegation and affirmatively averred that she purchased the property from her brother, paying him in cash therefor the agreed price of $1500.
 

 The district court rejected the demands of plaintiff, following a trial of the merits, and she is appealing.
 

 Plaintiff and Oliver Combre were married on December 19, 1940, and of the union one child was born. In 1944 they acquired and moved to the property in question, paying therefor the sum of $1500. (At the time of the trial, according to the record, it was worth in excess of $2000.) On October 16, 1946, the assailed deed from Oliver Combre to his sister, the defendant, was passed before a notary public of Orleans Parish, Jerome Meunier, it reciting a cash consideration of $1500. Notwithstanding the purported sale the vendor and his family remained in possession of the property, without the payment of any rent, until his death approximately four months later (February 10, 1947). Thereafter, even until the trial of the case, his wife and child continued living in the premises, during which period no rent was demanded of them.
 

 In view of these undisputed facts and circumstances it is presumed that the sale was simulated, and, as a result, defendant carries the burden of proving that the recited consideration was paid as she alleged and that the transaction was genuine. Civil Code Article 2480; Peyton et al. v. Roth, 149 La. 147, 88 So. 773; Giles v. Kelly, 162 La. 512, 110 So. 738; Bauman et al. v. Pennywell et al., 164 La. 888, 114 So. 723; Olivier’s Minor Children v. Olivier, 215 La. 412, 40 So.2d 803. The defendant, in other words, must establish by a preponderance of the evidence that she acquired the property for an appropriate and valuable consideration.
 

 That she carries the burden of proving the reality of the sale is conceded by defendant. In the brief of her counsel it is said: “The plaintiffs, widow and child of Oliver Combre, denied that the $1500 was paid by the purchaser, and, as the vendor remained in possession of the property, the burden shifted to the purchaser to prove the genuineness of the sale.”
 

 The only question presented by the cause, therefore, is whether defendant has overcome the presumption of simulation by establishing by clear and convincing evidence the sale’s genuineness.
 

 The notary who officiated at the execution of the deed testified that no money
 
 *965
 
 passed between the parties in his presence; nor did either of them tell him the nature of the sale’s consideration. As a witness for plaintiff he offered to give his impression of the transaction; but, on objection from defense counsel, he was not permitted to do so.
 

 The only direct evidence introduced to prove payment of the recited consideration was the testimony of the defendant herself. She testified that immediately after the passage of the act she and decedent went to the latter’s home where, with only the two being present, she counted out $1500 in $10 and $20 bills and gave it to him, the money representing a portion of her savings effected since 1941 which she had been keeping in a .small box in her dwelling. However, she did not know the total amount she possessed in the box when that payment was made. Neither could she recall any definite sum she had on hand at any particular date after she commenced her savings. Also she was unable to testify whether she kept her money in the box in a flat or a rolled condition.
 

 Defendant’s savings, she further testified, resulted principally from earnings of her husband while serving in the army, although some came from wages that she received when she worked intermittently. Her husband’s gross pay, according to his testimony, ranged from $50 per month in 1941 (as a private) to $155 per month in 1945 (as a sergeant). Defendant and her husband, the record also discloses, have two children.
 

 In corroboration of defendant’s statements as to her being able to save the $1500 with which the property was purportedly purchased, her husband testified to having sent his wife from time to time incredible sums that he had acquired from his gambling experiences in the army. When asked whether his winnings averaged $200 or $300 per month he replied: “Sometimes I make —I have made as high as $800 or $900.” Further, to show his success at gambling, he testified:
 

 “Q. During a month, how much would your losses run? A. They were very light.
 

 “Q. You usually won? A. With the process I was using it was pretty hard for me to lose.
 

 “Q. What kind of gambling was it? A. I used to run the game and cut the game, and I don’t even need — automatically what I cut, I made.
 

 “Q. Where would you carry on that game ? A. On the post. The Commander knew about it, sometimes they would gamble there with us themselves. There is nothing to hide. That is one of the routines of the army; everybody is gambling. It’s nothing to shoot for $50 or $75, and all you have to hit is three or four licks like that and you have $400.”
 

 The defendant’s explanation for the purchasing of the house from her brother on
 
 *967
 
 October 16, 1946, was that “He wanted repairs done on it and he didn’t see how he could save enough to make the repairs.” But there was no evidence offered to show that she made any repairs on the property at any time up to the institution of this suit on December 3, 1947, more than a year later. If she entertained a desire to so aid her brother, as her testimony indicates she did, it is more reasonable to believe that she would have financed the necessary repairs, permitting him subsequently to reimburse her, rather than have him transfer the property to her name. It appears from the record, moreover, that defendant made no mention of the purchase to members of her own family or to plaintiff until long after the death of Oliver Combre.
 

 True, shortly after such death, the record shows, defendant pointed out to plaintiff a glass jar containing $1000 buried in a chicken house on the premises in question. According to the testimony of the defendant this was a part of the money which she paid to her brother; that he had told her where he was hiding it; and that she was the only other person who knew of the hiding place. But it does not appear that when disclosing the money she told plaintiff what it represented; rather, the record indicates that plaintiff was unaware of the purported sale until several months thereafter.
 

 Furthermore, immediately after making the disclosure the defendant took possession of that money, along with an additional $200 found under a mattress in decedent’s home, and carried it with her to an army camp in Georgia. Plaintiff testified that she delivered the money to defendant for “safe keeping” on the suggestion of the latter who advised that if she (plaintiff) kept it the “relief people” would take it away “because Oliver was on the relief.” Defendant explained that she accepted the money only for safe-keeping; but it does not seem that she was in a better position to perform this service than was plaintiff, particularly since she was required occasionally to move from one army camp to another with her husband. The money was returned to plaintiff only after she went to Georgia and demanded it from defendant.
 

 Plaintiff insists that the mentioned $1200 ($1000 contained in the buried jar and $200 found under the mattress) represented the accumulated savings of her and her husband. Although throughout their marriage he was unable to work (he was a tubercular), he received monthly welfare benefits, they having amounted to $37 initially and they gradually increased to $75 by 1946. When married in 1940 plaintiff, according to her uncontradicted testimony, had about $750; and thereafter she worked continuously for the Lane Cotton Mills Company (except for a time when her child Was born) receiving substantial wages. Some of these earnings are listed on income tax withholding receipts furnished her by the employer, and which were introduced in evidence, as follows: $1434.10 in 1944;
 
 *969
 
 $1856.35 in 1945; $1605.85 in 1946; and $1581.59 in 1947.
 

 Also uncontradicted is plaintiff’s testimony to the effect that she always turned over her entire wages to her husband, as he demanded, who bought the necessary groceries; and that, except for those necessities and for the purchasing of their home in 1944 and a Plymouth automobile ($350) in 1945, they spent very little money. All of her clothes and those for her child, she further testified, were supplied by a white lady for whom she did housework each week on her day off from the mill.
 

 Defense counsel direct our attention to a certain statement by plaintiff, made under cross examination, that she owned no cash money on the day her husband died; and he argues that such admission substantiates defendant’s position that the latter disclosed $1200 was a part of the consideration paid for the property. But.from a reading of the whole testimony of plaintiff it is clear that what she meant by the statement was that she had no cash in her possession at that time, but that she later had some when defendant “showed me my money.” And this is in keeping with her contention, to which reference is above made, that the money found was that which her husband had saved from her earnings, she having turned over to him all of her wages.
 

 In challenging the veracity of plaintiff defense counsel relies on a discrepancy noted in her testimony, it being that at first she denied that defendant showed her the hidden money and that later she admitted this fact. But the inconsistency is not difficult to understand. Her answers to the numerous questions propounded to her, as well as certain remarks of the district judge during the trial, indicate that she is a person of little education and that while on the witness stand she was highly nervous and upset. Tod, such discrepancy, it may be observed, is of no greater magnitude than some of the contradictions appearing in the testimony of defendant who was shown to be a more educated person.
 

 A circumstance of importance, although not having any. direct connection with the instant transaction, is that defendant purportedly purchased decedent’s Plymouth automobile a few months prior to her taking title to the real estate. According to her testimony she paid him therefor $350 in cash, the money having come from the same little box in which she kept her savings. But, like the house, the automobile remained in decedent’s possession. After his death defendant obtained possession of the car so that she could drive to Georgia; and she then prevailed upon plaintiff, without telling the latter of the purchase, to endorse the applicable registration certificate in order that she might not be stopped by the highway police. When securing the endorsement, according to an apparently disinterested witness, defendant stated to plaintiff that the car belonged to the latter and that if she didn’t provide her signature the trip could not be made. Defendant de
 
 *971
 
 nied having made this statement. Nevertheless when plaintiff retained counsel and threatened criminal prosecution defendant returned the automobile to the former’s residence where it has since remained. Defendant explained the return by saying that the car was then worthless. However, the inventory taken thereafter in decedent’s succession proceedings disclosed its appraised value to be $250.
 

 Containing certain features very similar to some of those of the present controversy was the case of Peyton et al. v. Roth, 149 La. 147, 88 So. 773, 774. Therein the plaintiffs sought to have declared null, as fraudulent simulations, two sales of real estate in the City of New Orleans made by their late father, John Schlumbrecht. In deciding in favor of the plaintiffs this court observed :
 

 “The evidence shows conclusively that Schlumbrecht remained in possession and regarded himself as the owner of the property, and was generally so regarded, as well after as before he made the two sales. Under these circumstances, the burden of proof was on the defendant to show that a valid consideration was paid for the property.
 

 * ■ * * * * *
 

 “The only proof offered by defendant to show that he paid the price stated in each act of sale was his own testimony and that of his wife. (In the instant case the only direct proof was that of the defendant.) They testified that the price was paid in currency, in bills of large denominations; that the money had been saved from defendant’s salary of $125 to $150 a month, and had been accumulating for about 20 years; that they had kept the money in an ordinary tin bank box, in a wardrobe, in their bedroom; and that it amounted to about $2,500 at the time of the first sale.” (Parenthesis ours.)
 

 And even though there was, additionally, a statement in the will of the vendor that the sales were bona fide and that he had received the price therefor, the court ruled : “Our conclusion is that defendant has failed to overcome the presumption established by article 2480 of the Civil Code and the strong circumstantial evidence supporting that presumption.”
 

 The strong circumstantial evidence referred to in the opinion of the Peyton case was the absence of 'proof that the vendor ever had in his possession after the sales money in the sums called for by the respective deeds.
 

 In the case presently before us it must be said that Oliver Combre had at least $1200 in his possession after the execution of the deed to defendant (this is a distinguishing feature between the two cases). However, it is not at all certain, particularly in view of plaintiff’s testimony regarding her earnings and the strong corroboration thereof provided by the income tax withholding receipts, that, the sum so possessed did not represent the savings of plaintiff and her husband.
 

 
 *973
 
 From our thorough consideration of the entire record, therefore, we conclude that the defendant, as she was obliged to do, has not established by clear and convincing evidence the reality of the attacked sale and, thus, has not overcome the presumption of simulation provided for by Civil Code Article 2480.
 

 For the reasons assigned the judgment appealed from is reversed and set aside and there is now judgment in favor of plaintiff and against the defendant revoking and annulling that certain act of sale executed by Oliver Combre in favor of Hattie Combre Brown, passed before Jerome Meunier, Notary Public, on October 16, 1946, and recorded on October 17, 1946, in Book 544, Folio 611 of the Conveyance Office of Orleans Parish, which said act covers and affects the following described property:
 

 “One Certain Lot Of Ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes and advantages thereunto belonging or in any wise appertaining, situated in the First District of the City of New Orleans, in Square No. 619/493, bounded by Clio, Calliope, S. Dupre and S. White Streets, designated by the No. 8 on a plan of survey by W. J. Warren, Civil Engineer, dated August 21, 1921, a blue print of which is annexed to a Dation en Paiment dated May 15, 1936, passed before Gabriel Fernandez, Jr., Notary Public, and according to which said lot measures thirty feet, four inches and three lines front on Clio Street, by a depth of one hundred and fifty feet, between equal and parallel lines, and commences at a distance of one hundred and fifteen feet from the corner of Clio and S. Dupre Streets.
 

 “The improvements thereon hear the Municipal No. 4115 Clio Street.
 

 “Being the same property which the said Oliver Combre acquired from Wallace Combre, as per an act passed before Jerome Meunier, Notary Public of Orleans Parish, dated August 18, 1944, and registered in the Conveyance Office of this Parish in Book 533, Folio 40.”
 

 It is further ordered that the defendant pay all costs of this suit.