McCALEB, Justice.
 

 This case involves a settlement of the community of acquets and gains formerly existing between plaintiff, Mrs. Frances Page Thigpen, and her husband, Pooler B. Thigpen, Sr., one of the defendants,
 
 [1]
 
 
 *217
 
 the comrrmnity having been dissolved as of May
 
 7,
 
 1952, by a decree of separation from bed and board.
 

 After hearing the evidence and the argument on the various claims advanced by plaintiff and the reconventional demands of defendant, the trial judge rendered judgment denying plaintiff’s principal demands and also rejecting several claims of defendant. Plaintiff has appealed from this judgment and defendant has answered the appeal.
 

 The principal issue in the case concerns a transfer from defendant to his son, Pooler B. Thigpen, Jr., of all the real property owned by the community which existed between plaintiff and defendant, along with the attendant crops, cattle and farm equipment. This transfer, made by authentic act on June 27, 1951, was for a recited consideration of $31,000 of which $1,000 was paid in cash and the balance represented by 15 promissory notes, each for the sum of $2,000, payable over a period of 15 years. The purported sale was made subject to a balance of $8,004.31 owing on a chattel mortgage on the cattle granted by defendant in favor of the Tallulah Production Credit Association in the principal amount of $10,000.
 

 Plaintiff seeks to have the sale set aside as a simulation or, in the alternative, that she be decreed the owner of one-half of said property, alleging that the transfer was made in fraud of her vested rights in the community. The trial judge held for defendant on this issue, finding the sale to be neither a simulation nor in fraud of plaintiff’s rights.
 

 Before addressing ourselves to the legal problems presented it is necessary to delve somewhat into the backgrounds of the parties involved up to June 27, 1951, the date of the alleged sale.
 

 Defendant was first married to Delia Lancaster, which marriage was terminated by the latter’s death. Two children were born of this marriage, one of whom, Pooler B. Thigpen, Jr., is a co-defendant in the instant suit, being the vendee in the purported sale of June 27, 1951.
 

 In 1938, after the death of his first wife, defendant married plaintiff and three children were born of this union. It was during this marriage that defendant purchased three tracts of land in Madison Parish, Louisiana, totalling some 494 acres, that were purportedly sold to his son on June 27, 1951. The largest of these tracts, known as Enoka Plantation, was purchased in 1942 and the parties established the matrimonial domicile on this property, where it remained until their separation.
 

 There is evidence that the relationship between plaintiff and defendant was deteriorating rapidly in the early part of 1951 and, on November 14, 1951, plaintiff filed suit against her husband praying for á
 
 *219
 
 separation from bed and board, the custody of their children, $400 per month for maintenance and for an inventory and appraisement of the property and a writ of sequestration. Since both parties in their pleadings in the separation suit made various allegations of misconduct which, if testified to, would have been a source of great humiliation to all concerned, the parties agreed, upon the suggestion of the court, that defendant would secure the separation on the ground of abandonment.
 
 [2]
 
 His answer was amended accordingly and, on May 7, 1952, judgment was rendered against Mrs. Thigpen decreeing a separation from bed and board.
 

 In the trial proceedings in the instant suit counsel for plaintiff, in an effort to show the strained relationship existing between plaintiff and defendant on June 27, 1951 (the date of the alleged sale of the 494 acres, etc. from defendant to his son), embarked on a line of questioning which could only have resulted in bringing to light various embarrassing circumstances which the trial court was successful in keeping out of the record in the separation suit. Whereupon, on the advice of the trial judge, it was stipulated that:
 

 “Defendant has admitted that a state of animosity existed with all that the word connotes and in its strongest meaning between the two spouses as of June 27, 1951.”
 

 The record leaves no doubt that the sale under attack was inspired by the hostility between defendant and his wife and we also think that the circumstances surrounding the transaction make the conclusion inescapable that it was his deliberate intent to injure his wife at a time when dissolution of the community estate was imminent. Let us examine these circumstances.
 

 At the time of the sale, defendant’s son was an employee of the State Highway Commission and had not theretofore' engaged to any great extent in the business of farming. It is evident also that the son had not the financial resources to make such a sizeable purchase, it being shown that his bank account carried only small sums prior to the sale (his largest balance in May, 1951 being $255.65 and in June, $107.59), yet his uncorroborated testimony is that the $1,000 which he gave his father as a cash payment on the purchase price had been kept by him at his residence. After the sale defendant remained in full possession of the homestead and the only change resulting from the transfer was that the son came on the property each day and apparently took over the management of the farming operations. However, defendant
 
 *221
 
 continued to exercise some control of these operations, selling, either for his own account or that of his son or for their joint account,
 
 [3]
 
 an undetermined number of cattle and paying the proceeds from these sales, amounting to approximately $6,000, to Tallulah Production Credit Association, the holder of the chattel mortgage.
 

 Although the sale .was by authentic act and timely registered, the wife had no actual notice thereof. Indeed, defendant concealed from plaintiff the fact of the sale for, when she asked him to explain the presence of his son on the plantation, he informed her that he had engaged him “to work for me”.
 
 [4]
 

 While the foregoing factors stamp the transaction with the badge of fraud and also create a presumption of simulation under Article 2480 of the Civil Code
 
 [5]
 
 , see
 
 *223
 
 Succession of Combre, 217 La. 955, 47 So. 2d 734 and Stipe v. Simon, 223 La. 542, 66 So.2d 330, we are unable to sustain plaintiff’s primary demand to set aside the sale as defendants have successfully rebutted the presumption of simulation by written and oral evidence revealing a valuable consideration passing to defendant from his son. The sale was by authentic act and one of the witnesses thereto testified that he distinctly remembered the payment of the stated cash consideration of $1,000. In addition, the son gave his father promissory notes in the amount of $30,000 secured by a vendor’s lien and special mortgage on the property.
 
 [6]
 

 Counsel for plaintiff vigorously assail the reality of the $1,000 cash payment by the son, claiming that defendant actually furnished the money. Whereas the circumstantial evidence tends to support this claim (it being shown that the father made several large withdrawals from the community bank account shortly before the alleged sale and it appearing that the son had not a sufficient amount in his own bank account to supply the $1,000 cash payment), the sale cannot be considered as simulated under the jurisprudence since the son has obligated himself to pay $30,000 in addition, evidenced by promissory notes secured by vendor’s lien and special mortgage on the property. Brown v. Brown, 30 La.Ann. 966; Renshaw v. Dowty, 39 La.Ann. 608, 2 So. 58; Peyton v. Roth, 149 La. 147, 88 So. 773; Harman v. Defatta, 182 La. 463, 162 So. 44; Citizens’ Bank & Trust Co. v. Willis, 183 La. 127, 162 So. 822 and Succession of Nelson, 224 La. 731, 70 So.2d 665. The notes are presently assets of the community and we feel bound to give recognition to the obligation created by them as real consideration for the transfer.
 

 On the other hand, as we have above indicated, we think it clear that the sale was conceived in fraud by the defendant and deliberately confected for the purpose of injuring plaintiff’s interest in the community estate.
 

 In her alternative claim based on fraud, plaintiff asks that we recognize her as owner of an undivided interest in the property in indivisión with defendant’s son. This we cannot do as the law does not give to a wife, who has sustained injury by a conveyance of community property in fraud of her rights, a right of action for rescission of the transaction — such as the revocatory action available to creditors for the purpose of setting aside the fraudulent conveyances of their debtors.
 

 The only article of our Code granting to a wife a remedy for the injury sus
 
 *225
 
 tained as the result of a transfer of the community property, such as the one presented here, is Article 2404 which primarily recognizes the right of the husband, as head and master of the community, to administer its effects, dispose, of its revenues and alienate them by onerous title without the consent and permission of his wife. It provides, however, that he may not give away the immovables nor even the whole or a quota of the movables except for the establishment of the children of the marriage.” The fourth paragraph of the Article reads:
 

 “But if it should be proved that the husband has sold the common property, or otherwise disposed of the aime by fraud, to injure his wife; she may have her action against the heirs of her husband, in -Support of her claim in one-half of the property, on her satisfactorily proving the fraud.”
 

 Imprimis, counsel for defendant contend that this provision affords the wife an action against the heirs of the husband only and not against the husband himself.
 

 This contention is without merit. Article 2404 of the present Civil Code can be traced'to Article 66 of the Civil Code of 1808, which provided:
 

 “The husband is the head and master of the partnership or community of gains; he administers said effects; disposes of the revenues which they produce, and may sell and even give away the same without the consent and permission of his wife,
 
 because she has no sort of right in them until her husband be dead.
 

 “But if it should be proved that the husband has sold said estate or otherwise disposed of the same by fraud to injure his wife, she may have her action against the heirs of her husband, in support of her claim of one half of said estate, on her satisfactorily proving the fraud.” (Emphasis supplied.)
 

 It is readily seen that this article, the last paragraph of which is virtually identical to the last paragraph of Article 2404 of the present Civil Code (reproduced earlier .in this opinion), contemplates the wife having no rights in the community until the death of her husband. However, it has long, since been established that the wife has a vested interest in community property at the time it is acquired
 
 [7]
 
 and is entitled to one-half of the assets of the community at its dissolution, whether it be by death, divorce or judicial separation. Consequently, the only logical view to be accorded Article 2404 is that it gives to the defrauded wife an action against her husband in the event the community is dis
 
 *227
 
 solved by divorce or judicial separation.
 
 [8]
 
 This right was specifically recognized in Oliphint v. Oliphint, 219 La. 781, 54 So. 2d 18.
 

 Counsel for defendant further maintain that the wife has no action against her husband by reason of his having sold community property before the institution of a suit for separation, citing Tourne v. His Creditors, 6 La. 459, to sustain this proposition. See also Belden v. Hanlon, 32 La.Ann. 85.
 

 Suffice it to say that these two decisions, founded on an outmoded concept of community property, are hereby overruled insofar as they hold that a wife has no action against her husband arising from a sale of community property by him prior to the institution of a suit for separation, such a ruling being in direct conflict with the last paragraph of Article 2404 of the Civil Code.
 

 Thus, it is clear that, in line with the established jurisprudence, the fourth paragraph of Article 2404 of the Civil Code vests in the wife by necessary implication a right of action to hold her husband responsible, in an action for settlement of the community property following its dissolution by a judgment of separation from bed and board or divorce, for the losses resulting to her by reason of the husband’s sales of community property during the marriage, disposed of by fraud and with intent to injure her. The right thus afforded is conditioned upon two elements, (1) the sale of property conceived with the intent to reduce the wife’s community interest, and (2) actual injury resulting therefrom.
 

 In the case at bar, there is not the slightest doubt of the defendant’s intent to injure plaintiff’s community interest by selling the land to his son at a time when a dissolution of the community by suit for separation or divorce was imminent. Hence, it remains only to determine whether she has suffered a loss by reason of the sale, that is, whether the consideration given by defendant’s son was less than the market value of the property conveyed.
 

 The act of sale specifies the real estate conveyed therein to be valued at $17,290. This means that the herd of cattle and the farm equipment were valued at $31,000 less $17,290, or $13,710.
 

 Plaintiff alleges and testifies that the 99 head of cattle included in the sale had a market value of $16,000 at the time of the transfer. However, this valua
 
 *229
 
 tion is unsubstantiated and conflicts with an appraisement made in May, 1953, pursuant to a court order, which put a value of $11,730 on 175 head of cattle. Plaintiff asserts that this Court should take judicial cognizance of the fact that the bottom fell out of the cattle market in July of 1952. This, of course, we will not do and, since plaintiff has offered no real proof as to the market value of the cattle or the farm equipment conveyed on June 27, 1951, we are constrained to hold that $13,710 was a fair price for same.
 

 Conversely, we do not feel that $17,290 was an equitable price for the. land conveyed.
 

 Enoka Plantation contains 420 acres of black land or buckshot soil, suitable for row crops and pasture. The plantation includes a residence, a large barn and several tenant houses. The value put on Enoka in the appraisement of May, 1953, was $29,400, or $70 per acre.
 

 The three witnesses called by plaintiff to testify as to the market value of Enoka as of June, 1951, gave the following estimates: $28,000, $29,400 and $38,610. Two of these witnesses are.to be regarded as experts, having been engaged in the real estate business for many years in the Louisiana-Arkansas-Mississippi River Delta country.
 

 Defendant called three witnesses (two farmers and a banker living in the vicinity) who placed a much lower value on the property. One witness thought it was worth $25 per acre, another estimated $22.50 per acre and the third merely stated that he would not pay as much as $35 per acre for it. Their testimony indicates that the figures given by them were not so much what the market value of this land was in June of 1951 but, rather, what they would pay for it.
 

 After considering the conflicting testimony we are convinced that the market value of Enoka Plantation at the time of the sale was $29,400, the value placed upon it less than two years after the sale by the appraisers appointed in these proceedings, it being our view that the property’s value had not appreciably changed since 1951.
 

 As. to the other two tracts conveyed, total-ling some 74 acres, we are for the same reasons inclined to value it at the figure given by the appraisers. This was $50 per acre, or a total of $3,700.
 

 Accordingly, we find the market value of the property at the time of the conveyance to be $13,710 for the cattle and equipment; $29,400 for Enoka Plantation and $3,700 for the other two tracts, or a total of $46,810. Deducting from this the sum of $31,000 received by defendant leaves a deficiency below market value of $15,810, thus, resulting in a loss to plaintiff of $7,905, which she is entitled to recover from defendant.
 

 
 *231
 
 The next item concerns insurance proceeds in the amount of $33,969.04, received by defendant after the death of W. J. Thigpen, his other son by the first marriage. Defendant asserts that these funds were his separate property and argues that, since $23,870.96 of these monies was spent towards the enhancement of the community, the community is indebted to him for this amount. The trial judge found for defendant in this matter but reduced the amount prayed for by $6,000, thus holding defendant to be a creditor of the community to the extent of $17,870.96. Both parties are contesting this ruling.
 

 These insurance proceeds were paid to defendant on five policies taken out by defendant on the life of W. J. Thigpen. The latter was killed in 1947 and defendant received the insurance payments in 1947 and 1948, during the existence of the community between defendant and plaintiff. Accordingly, since the funds were acquired by defendant during the existence of the community, they are presumed to be community property.
 

 Defendant’s position appears to be that the insurance money was his separate property as it was a particular donation within the meaning of Article 2334 of the Civil Code.
 
 [9]
 

 An analysis of the jurisprudence reveals that, where life insurance is taken out in favor of the insured’s estate, or of his executors, administrators or assigns, the status of the proceeds of such life insurance, i. e., whether separate or community property, depends upon whether the contract of insurance was made during the existence of the marital community. In re Moseman’s Estate, 38 La.Ann. 219; Succession of Buddig, 108 La. 406, 32 So. 361; Succession of Verneuille, 120 La. 605, 45 So. 520; Succession of LeBlanc, 142 La. 27, 76 So. 223, L.R.A.1917F, 1137; Succession of Farrell, 200 La. 29, 7 So.2d 605; Easterling v. Succession of Lamkin, 211 La. 1089, 31 So.2d 220 and Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169.
 

 While in the instant case the policies were taken out on the life of a third person rather than on the life of the husband himself, the principle is the same (assuming the premiums were paid out of community funds),
 
 [10]
 
 since the proceeds were paid on policies taken out by defend
 
 *233
 
 ant. Therefore, we shall turn our attention to the dates on which the policies were taken out, bearing in mind that the burden was on defendant to establish that the proceeds of the insurance did not fall into the community.
 

 The testimony as to when these various policies were issued is not too clear. From the attached exhibits, we have determined that one policy (with the Standard Life Insurance Company of Indiana) was issued August 24, 1942, and we accordingly find that the proceeds from this policy, $11,027.20, fell into, the community.
 

 Conversely, it appears that policies with the Texas Life Insurance Company, the Guardian Life Insurance Company and the Aetna Life Insurance Company were issued prior to February 4, 1938 (the date ■defendant and plaintiff were married) and we conclude that, when the proceeds of these policies (totalling $12,893.64) were received by defendant, they were his separate property. However, these funds were deposited in the community bank ac■count and an inspection of this account reveals that they were commingled with community monies to such an extent that it would be practically impossible to deduce that the separate funds, when spent, had been used to enhance the community. Succession of Ferguson, 146 La. 1010, 84 So. 338; Succession of Provost, 190 La. 30, 181 So. 802 and Abunza v. Olivier, 230 La. 445, 88 So.2d 815.
 

 A final policy, taken out with Aetna Life Insurance Company, paid $10,048.20. Since defendant has offered no proof as to when this policy was issued, we presume it was after his marriage to plaintiff and hold the proceeds therefrom to be community property.
 

 Thus, we find that there has been no enhancement of the community by the expenditure of defendant’s separate funds and that the trial judge erred in finding defendant to be a creditor of the community in the amount of $17,870.96.
 

 Plaintiff, relying upon Article 2408 of the Civil Code, claims that defendant is indebted to her for the sum of $3,175 as a result of improvements made on defendant’s separate property with community funds. The basis of this demand is that several buildings located on Oak Grove Plantation, owned in indivisión by defendant and the heirs of his first wife, were destroyed by fire and were replaced with community funds (consisting principally of insurance proceeds from policies the premiums for which were paid out of community funds).
 

 In view of the somewhat confusing evidence, we feel that the trial judge did not err in disallowing this claim. It is not made clear how much money was
 
 *235
 
 spent in replacing the buildings on Oak Grove Plantation, over and above the proceeds of the fire insurance. Insofar as the insurance proceeds are concerned, it seems evident that they were the property of the owners of Oak Grove Plantation (defendant and the heirs of his first wife), even though community funds were used to pay the insurance premiums. It may be that the owners of Oak Grove Plantation are indebted to the community for the amount of these premiums but no claim is made herein for any such reimbursement.
 

 Defense counsel argue that plaintiff’s demand should be rejected because the income from Oak Grove Plantation fell into the community and, therefore, it is but just and equitable that the expenditures necessary for the preservation of the property be borne by the community. Succession of Boyer, 36 La.Ann. 506 and Succession of Ratcliff, 209 La. 224, 24 So.2d 456 are cited in support of this proposition.
 

 We do not think that the cited cases are applicable here for the reason that there is no proof in the record as to the amount of revenues received by the community from Oak Grove Plantation, one-half of said revenues being payable to the heirs of defendant’s first wife.
 

 However, plaintiff has failed to show to what extent community funds were used to enhance the value of Oak Grove and we therefore dismiss her claim in this, respect.
 

 The next disputed item involves a safety deposit box at the Tallulah State Bank & Trust Company, registered in the name of W. J. Thigpen, Jr., defendant’s grandson. This box, when seized pursuant to a court order on November 17, 1951, contained $5,200 in cash. The trial judge rejected plaintiff’s claim that this money was community property, it being his opinion that this fund represented proceeds from the sale of cotton grown on Oak Grove Plantation and had been put aside by defendant for his grandchildren, who are owners in indivisión of one-fourth of this property.
 

 The trial judge erred. It appears from the evidence that the lock box had been formerly registered in defendant’s name and was transferred to his grandson’s name at a time when defendant and plaintiff were having marital difficulties. Defendant retained both keys
 
 to
 
 the box after changing the registration and apparently never informed his grandson that the box had been transferred to his name.
 

 As to the origin of the $5,200, defendant’s testimony is evasive and contradictory. In the separation suit (the record of which is attached as an exhibit in the instant proceeding), defendant stated that the $5,200 was his insurance money. In the instant suit he declared that the money belonged to his grandchildren but he stated
 
 *237
 
 that he did not remember when it. was put in the box or from what source, other than from the sale of cotton “grown, most of it, on Oak Grove”.
 

 This money, acquired during the existence of the community, is presumed to be community property and defendant has completely failed to overcome this presumption. We therefore hold the $5,200 to be a community asset.
 

 In his reconventional demand, defendant claimed that two diamond rings in the possession of plaintiff be recognized as community property and, alternatively, that, in the event the rings should be adjudged to have been donated to plaintiff, the judgment of separation from bed and board in his favor effected a revocation of such gifts entitling him to be recognized as having a one-half interest in the rings.
 

 The trial judge denied this claim, holding that the rings were gifts from defendant to plaintiff and became her separate property. In his answer to the appeal, defendant contends that the judge erred in not setting aside the donation of one of the diamond rings (valued at $900) which was given to plaintiff during the marriage and in not declaring this ring to be an asset of the community.
 

 The contention is well founded. Article 156 of the Civil Code declares:
 

 “In case of separation from bed and board, the party against whom it shall have been pronounced, shall lose all the advantages or donations, the other party may have conferred by the marriage contract or since, and the party at whose instance the separation has been obtained, shall preserve all those to which such party would have been entitled; and these 'dispositions are to take place even in case the advantages and donations were reciprocally made.”
 

 The foregoing provisions are clear and must be enforced as written. Forasmuch as defendant secured the separation from bed and board and it not being disputed that the diamond ring (presumably purchased with community funds) was donated during the marriage, it follows that the effect of the decree of separation requires that the ring be considered as part of the
 
 common
 
 property and not as separate property.
 

 It appears from the judgment in the proceedings for a separation from bed and board that plaintiff was granted an award of $700 against defendant for her attorney’s fees. This judgment was signed on May 7, 1952 and no appeal was taken therefrom. Yet defendant asserts in the reconventional demand filed in this proceeding that he was improperly cast for these attorney’s fees and that the community should be held ac
 
 *239
 
 countable therefor. The judge denied this claim and defendant complains of the ruling in his answer to the appeal.
 

 The judge was correct. Although it is now well settled that the attorney’s fees of the wife in separation and divorce proceedings are chargeable only against the community, see Glorioso v. Glorioso, 223 La. 357, 65 So.2d 794 and Tanner v. Tanner, 229 La. 399, 86 So.2d 80, defendant did not appeal from the judgment in the separation suit and it has long since become final. He cannot have the alleged error corrected in these proceedings.
 

 Plaintiff contends that the judge erred in awarding defendant’s attorneys a fee of
 
 $1,000 to be
 
 charged against the community assets. The complaint is that there is no evidence in the record to show the value of the services rendered by defendant’s counsel.
 

 There is no merit in the contention. The services were rendered under the eye of the court. Hence, the judge was fully able to estimate the value of the services and order that they be charged to the community estate.
 

 Finally, plaintiff sets forth that the judge erred in failing to decree that $6,151.-63, on deposit in defendant’s bank account in Tallulah State Bank & Trust Company, is community property.
 

 There is apparently no dispute as to the ownership of this bank account by the community. The judge evidently overlooked it in drawing his decree.
 

 For the foregoing reasons, the judgment appealed from is reversed in part and it is now ordered (1) that plaintiff have judgment against defendant in the full sum of $7,905, with legal interest thereon from judicial demand until paid; (2) that the ruling of the trial court that defendant is a creditor of the community in the sum of $17,870.96 be set aside and annulled; (3) that the cash sum of $5,200 contained in a safety deposit box at the Tallulah State Bank & Trust Company, registered in the name of W. J. Thigpen, Jr., and the sum of $6,151.63 deposited in the name of defendant in the Tallulah State Bank & Trust Company be and they are recognized as belonging to the community of acquets and gains heretofore existing between plaintiff and defendant; and (4) that a certain diamond ring, valued at $900, in the possession of plaintiff be and it is recognized as property of the community estate.
 

 In all other respects, the judgment is affirmed. The costs of this appeal are to be borne by defendant; all other costs are to be paid out of the community estate.
 

 SIMON, J., concurs in the decree.
 

 [1]
 

 . Pooler B. Thigpen, Jr., and the Tallulah Production Credit Association were also made defendants in this cause (although the suit was dismissed as to the latter prior to the conclusion of the trial). However, for the purposes of this opinion, the term “defendant” will refer only to Pooler B. Thigpen, Sr., unless otherwise noted.
 

 [2]
 

 . Mrs. Thigpen vacated the matrimonial domicile on August 16, 1951, taking her two youngest children with her.
 

 [3]
 

 .The evidence shows that, on the date of the sale, the father drew a $500 check in favor of the son which was endorsed by the latter and deposited in his bank account with Tallulah State Bank & ■ Trust Oo. Thereafter, on various dates between July 30, 1951 through November 13, 1951, large sums of money were withdrawn by defendant from the community banking account. Some of these checks were payable to cash (two of which were endorsed by the son, i. e., check dated July 30, 1951 for $1,000, which was deposited in the son’s account on the same day, and one dated October 25, 1951 for $1,000) and others (one for $500 dated September 20, 1951, one for $3,-000 dated November 13, 1951, the day before the suit for separation was filed by plaintiff, and another on the same date for $879.06) payable to the son and deposited in the latter’s bank account. Similarly, the son made numerous cash withdrawals from his personal checking account during the period above mentioned and three of these checks, amounting to a total of $3,583.62, were made payable to his father. However, only $2,583.62 was deposited by the father in the community bank account. The numerous .cash withdrawals are explained by the father and son as withdrawals for the payment of farm labor and other operating expenses of Enoka Plantation and Oak Grove Plantation, which was the separate property of defendant and owned in indivisión by him with his son and grandchildren of the first marriage. At any rate, we think it manifest, from the bank records in evidence, that-there was at least a tacit understanding between the son and the father for the operation of the two plantations as a joint enterprise and that the community bank account was depleted by defendant’s withdrawals which found their way into the son’s bank account. These withdrawals, amounting to $6,879.06, remain unexplained by father and son. 'The check payments of the son to
 
 the
 
 father, amounting to $3,583.62, are accounted for to the extent of $2,583.62, this being the payment of the first installment note, on the purchase price of the property, with interest.
 

 [4]
 

 . On the witness stand, defendant baldly admits his deception, stating: .“I told her I was going to try to get him to work for me. I had to have someone and she- said she wasn’t, going to fool with it” and “I told her I had to have somebody, I couldn’t see, couldn’t get around and tend to it.”
 

 [5]
 

 . It reads: “In all eases where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale' is simulated, and with respect to third persons, the parties must produce proof that they are acting in good faith, and establish the reality of the sale.”
 

 [6]
 

 . There is evidence in the record that, at the time the instant suit was filed, at least one of the $2,000 notes had been paid, along with $1,983.62 in interest.
 

 [7]
 

 . Phillips v. Phillips, 160 La. 813, 107 So. 584; Succession of Wiener, 203 La. 649, 14 So.2d 475 and Frazzio v. Krieger, 226 La. 511, 76 So.2d 713.
 

 [8]
 

 . Guice v. Lawrence, 2 La.Ann. 226, decided by this Court in 1847, held that the wife’s only recourse in such circumstances is against the heirs of the husband. But this decision, predicated on the now obsolete theory that the wife has no rights in the community until the marriage is dissolved by the death of the husband, has been overruled by implication. See Phillips v. Phillips, 160 La. 813, 107 So. 584.
 

 [9]
 

 . This Article defines separate property as follows: “Separate property is that which either party brings into the marriage, or acquires during the marriage with separate funds, or by inheritance, . or by donation made to him or her particularly.”
 

 [10]
 

 . Defendant, while admitting that the premiums on these policies were paid out of community funds, insists that the insured, W. J. Thigpen, reimbursed the community these amounts. This testimony, unreinforced by any corroborating evidence or circumstances, is utterly unconvincing.